THOMSON–HOUSTON ELECTRIC CO. v. ELMIRA & H. RY. CO. (two cases).

(Circuit Court of Appeals, Second Circuit. January 8, 1896.)

Nos. 109, 121.

1. PATENTS—TWO PATENTS FOR SAME INVENTION—IDENTITY OF CLAIMS.
   In determining whether two patents to the same person cover the same invention, so as to render the later one void, the test of identity is whether the claims of both, when properly construed in the light of the descriptions, define essentially the same thing.

2. SAME.
   A machine or structure may embody several different inventions; and, while two or more inventions residing in the same combination or structure may be covered by different claims in the same patent, they may, at the option of the patentee, be secured by different patents. And it is immaterial that both inventions originate at the same time, and from a single conception.

3. SAME—MINOR IMPROVEMENTS.
   The granting of patents for distinct and specific structural improvements pending an application for the broad invention will not invalidate a patent subsequently granted for the latter, although the elements covered by its claims were described and illustrated, but not claimed, in the earlier patents. 69 Fed. 257, affirmed.

4. SAME—ELECTRIC RAILWAY TROLLEY SWITCHES.
   The Van Depoele patent, No. 424,695, for improvements in suspended switches and traveling contacts for electric railways, considered, and held, that claim 2, which is for an overhead conductor arranged to receive a traveling underneath contact, in combination with a switching device secured to and depending from the conductor, is void for want of patentable novelty; that claims 3, 11, and 19, which relate especially to a switching plate attached to the wire, disclose patentable invention, and are infringed by defendant's combination; that claims 9 and 10, which relate specifically to the conductor switch, are void for want of patentable novelty; that claims 4, 20, 23, 25, 26, and 27, which relate to the arrangement of the track switch in such relation to the conductor switch and the trolley that the movement of the forward part of the car onto the branch track will deflect the trolley wheel, so as to guide it naturally into the proper compartment, show patentable novelty, and are infringed by defendant; that claims 32 and 33, which relate to the centralizing spring controlling the lateral movement of the trolley arm, show patentable invention, and are infringed; and that claims 15, 16, and 17, relating to the combination of a pivoted trolley arm and its weight and spring mechanism, are not infringed by defendant's devices. 69 Fed. 257, reversed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This was a suit in equity by the Thomson-Houston Electric Company against the Elmira & Horseheads Railway Company, a corporation operating an electric railway in the city of Elmira, New York, for alleged infringement of the Van Depoele patent, No. 424,695, for

improvements in suspended switches and traveling contacts for electric railways. In the circuit court the patent was held valid and infringed, except as to certain claims. 69 Fed. 257. From this decree both parties appeal.

Duncan & Page (S. A. Duncan, F. P. Fish, and F. H. Betts, of counsel), for Thomson-Houston Electric Co.

Kerr & Curtis (Wm. A. Jenner and Thos. B. Kerr, of counsel), for Elmira & H. Ry. Co.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. In this cause there are cross appeals. The suit was for the infringement of letters patent to Charles J. Van Depoele, No. 424,695, dated April 1, 1890, for improvements in suspended switches and traveling contacts for electric railways. The defendant appeals from so much of the decree as sustains claims Nos. 2, 3, 4, 9, 10, 19, 20, 23, 25, 26, 27, 32, and 33, and awards an injunction and an accounting. The complainant appeals from so much of the decree as dismisses the bill in respect to claims Nos. 15, 16, and 17 of the letters patent. The patent contains 35 claims. Some of them were withdrawn from the consideration of the court below at the hearing. As to some others, the complainant elected not to ask for a decree. None of these claims, therefore, are involved upon this appeal.

The principal question presented by the appeal on the part of the defendant is whether the claims which were sustained by the decree are void for want of patentable novelty, or because the several inventions had been previously patented by the same inventor. That these inventions have been appropriated upon the railway of the defendant is not contested.

The sole question presented by the appeal of the complainant is whether the defendant has infringed the claims as to which the bill was dismissed.

The patent was based upon an application, serial No. 230,649, filed March 12, 1887. This application was divided, and the application for the patent in suit filed October 22, 1888. The patent relates to electric railways in which there is a stationary source of electric energy, an overhead conductor extending over the line of track for conveying the power to the cars, electric motors on the cars for impelling the same, traveling contact mechanism, and tracks having branches and turnouts.

In the preamble of the patent the patentee states:

"My invention consists in certain devices and their relative arrangement, by means of which a contact device, carried by a rod or pole extending from the car and pressed upwardly into contact with the conductor, is switched from one line to another correspondingly with the vehicle.

"To illustrate my invention, I have shown it applied to a contact device of this description, which forms the subject-matter of my application, serial No. 230,649, of March 12, 1887; and while I do not intend to claim generally, in this application, a contact device of this construction, I have made claims herein to certain details thereof which are of especial value in connection with my improved switching devices, but which are not essential features of the contact device itself, considered without reference to the switch."

"I also make claims in this application to a switch plate particularly designed for the arrangement which forms the principal subject-matter of this application.

"More particularly, my invention consists in a track switch for the vehicle, a conductor switch for the contact device, or 'trolley,' as it is termed, and the trolley itself, attached to the vehicle; these elements being so arranged relatively to one another that in operation the vehicle reaches the track switch, and is diverted laterally, before the trolley reaches the conductor switch, whereby the trolley, which partakes of the lateral movement of the vehicle, has imparted to it a laterally moving tendency before its switch is reached, and it therefore passes through the switch in the proper direction corresponding to the movement of the vehicle.

"My invention also consists in various details of construction and arrangement, which will be hereinafter pointed out."

The specification describes the conductor switch as located at the junction of the main and branch conductor wires, practically above a corresponding track switch. It consists of an inverted, open-bottom, metallic box, depending from, and directly secured to, the wires, formed with branch compartments to correspond to the curves and angles of the track switch. As shown in the drawings, it is a plate of metal somewhat resembling the letter Y, with depending flanges at its two sides; the narrow end of the plate being turned in the direction of the main wire, and the other end being connected with both the main and the branch wire. The narrow end is wide enough to permit the easy movement of the trolley wheel through it, while the other end is wide enough to permit the trolley wheel to move out in either the direction of the main or the branch wire.

The contact device or trolley, as described, belongs to the order of "under-running" contacts, and, in the form shown in the patent, consists of a grooved wheel mounted upon an arm which is carried by the roof of the car, and pressed upward by the action of an elastic tension device (under the control of the attendant) so as to bring the wheel into engagement with the under side of the suspended conductor. The arm is mounted on the top of the car, and is pivoted and swiveled so as to be capable of swinging both vertically and horizontally through considerable arcs. Attached to its short arm is a tension device, consisting of a weight and spring, which operates to maintain normal contact between the trolley wheel and the suspended conductor, and enables the attendant to lower or raise the trolley. The arm is attached to the forward part of the car, and trails backward, and is of a length that will place the trolley wheel about over the rear wheels of the car.

The specification states:

"The track switches and the contact wheel, as before stated, are to be located so that, as the front portion of the car swings in the desired direction as the front wheels pass the track switch, the contact arm will be deflected, and the direction of the wheel, E, correspondingly changed, while still on the straight wire, so that on reaching the switch box the wheel will be depressed and pass thereinto, and naturally pass through and out of the proper compartment thereof. The switch boxes, I, being connected directly to the conductors, D, are similarly charged, and when the wheel, E, is passing therethrough, the current passes through the box, I, and thence into the contact wheel, through its flanges, e, passing thence through the arm, F, or a separate conductor, to the motor, C. Since there are no moving tongues or springs or

points to catch or impede the progress of the wheel when three or four grooves, as the case may be, exist in one switch box, the wheel will intersect the grooves, and pass along in the desired direction, and go through, without any difficulty whatever, its direction being previously indicated by the movement of the front portion of the car. Thus, it will be seen that by locating my traveling contact wheel in the position shown, or one equivalent thereto, I obviate all the difficulties of switching from conductor to conductor, and with the smallest possible amount of special construction. I believe myself to be the first to devise this arrangement of contact device and switches whereby the lateral movement of the vehicle is first imparted to the trailing contact arm, and the contact wheel is then flexibly, yet without interruption of contact, drawn into the switch, and guided thereby into engagement with the desired branch conductor; and I intend herein to claim broadly any relative arrangement of track switch, conductor switch, vehicle, and contact device by means of which the former switch will act in advance of the latter, and the vehicle impart a lateral tendency to the trailing contact by the time it engages with the conductor switch."

One group of the claims of the patent relate to the combination in an electric railway of an overhead conductor, an under-running contact device, and a switching device secured to the conductor. These claims are as follows:

"(2) The combination, with an overhead conductor arranged to receive a traveling underneath contact, of a switching device secured to and depending from the conductor.

"(3) The combination, with an overhead wire for receiving an underneath contact, of a switch plate attached to the wire in about the same horizontal plane as the wire."

"(11) The combination, with an overhead line wire, of a grooved contact device pressed against the wire, and receiving the wire between the flanges of the groove, and a guiding switch plate connected to the wire, against which the said flanges bear in passing from one line to another."

"(19) In an electric railway, the combination, with branching overhead conductors, of an upwardly pressed contact arm, carrying a grooved wheel embracing the conductor, and a switch plate at the branching point adapted to receive the tips of the wheel flanges, and provided with depending ribs, between which the wheel is free to move laterally to engage with one of the branch conductors."

It is insisted for the defendant that these claims are invalid because the switching device is merely the ordinary track frog used in a new place, without change in form or even in material, and performing the same function in precisely the same way, and, inasmuch as the combination was otherwise old, it was not invention to transfer the frog and secure it to the conductor. The proof shows that, in the prior state of the art, it was old to combine in an electric railway an overhead conductor, an under-running contact device, and means for switching the car upon a branch track, which included the transference of the contact device to a branch conductor. Such a combination appears in two earlier patents, one of which was granted to Sprague and the other to Van Depoele himself. In the structure of the Sprague patent there is an overhead suspended conductor, consisting of a rail having a flange at each side, and a contact device which has a wheel running in the channel formed by the flanges, and held therein by upward pressure. The specification contains this statement:

"When the switches extend from one track to another, the overhead conductor branches, and the conductor follows the switch track, so that, when the motor leaves the main track and passes upon the switch, its contact bear-

ing on the lower side of the overhead conductor follows the branch conductor to the other track."

In the structure of the Van Depoele patent, the overhead conductor is a suspended flat bar; the contact device is a flat trolley wheel, forced upward against the conductor by spring pressure; and at the branches there is the ordinary junction formed by the diverging conductors. The conductor is provided with a roof having depending edges, which, it is said by the complainant's expert, afford guiding effect to the contact device. The specification contains this statement:

"In order to make switches, and to enable the car to pass readily from one line to another, the flat surfaces of the conductors are united at the desired point, substantially as shown in Fig. 7; and, the under sides of all the conductors being flat and perfectly even, it will be readily understood that the roller, H, can pass freely from one to the other, and the car be moved in the direction determined by the direction of the track upon which it is traveling or to travel."

The description in each of these patents necessarily suggests that at the junction of the conductors the channel is free, otherwise the wheel could not be deflected along the branch conductor.

The device of the patent is neither a switch nor a frog, but it more nearly resembles the latter, and Van Depoele himself, in one of his later patents, terms a similar device a frog. Whether it would involve invention to transfer an ordinary track frog to the junction of branch conductors so analogous to the common rail as are those of the earlier patents, invert it, and unite it integrally with the conductors, we need not inquire. We think that such a frog, or an independent plate with depending ribs and branch compartments conforming to the curves of the track rails, when united with the conductor, would not perform any function in those structures which the conductors would not perform in its absence. The depending flanges of Sprague's conductor would do the same work, and apparently as efficiently. And, if the opinion of the complainant's expert is correct, the roof of Van Depoele's earlier suspended conductor, with its depending sides, would do the same work. That roof is practically an inverted, open-bottom box, having compartments defined at the junction of the conductors by the conductors themselves. Consequently, the structure of that patent contains essentially all the elements specified in the second claim of the present patent. We conclude, therefore, that this claim is void for want of patentable novelty. In view of the phraseology of the other three claims, the second claim cannot be restricted to a combination in which the contact device is grooved, or the overhead conductor is a line wire, because those claims are meaningless unless they are intended to specify the limitations which differentiate their respective combinations from that of the second claim.

The other three claims embrace among their constituents an overhead wire and a grooved contact device, or devices which are the equivalent of these. In a system employing these devices, a switch plate is indispensable. The switch plate of the patent is peculiarly adapted for use with a light, flexible conductor. It is simple, cheap,

light, and inconspicuous.   As a branch connection at the junction between such conductors, it is efficient, and its value has been generally recognized.   The ordinary track frog, as a structural device, has only a remote resemblance to it.   The suggestion that it could be utilized in an overhead line wire junction would seem ludicrous, and it could only be done by denuding it of its most conspicuous characteristics.   Various expedients for switching with such conductors have been resorted to by experts in the art.   The fact that they overlooked devices like the patented device, and resorted to clumsy or inconvenient means, cannot be ignored.   It was not a great invention, but that it was an invention requiring a degree of ingenuity somewhat beyond the ordinary skill of the calling we are unable to doubt.

There are two other claims in the patent which relate specifically to the conductor switch.   These are as follows:

"(9) In an electric railway, a switching device for suspended conductors, comprising two or more branching compartments or ways corresponding to the direction of the track, and of the main and branch conductors, and secured to the said suspended conductors, substantially as described.

"(10) In an electric railway, a switching device for suspended conductors, consisting of an open-bottom box formed with two or more branching compartments corresponding to the direction of the track, and arranged to be secured to the conductor, substantially as described."

The observations which have been made with respect to claim 2 apply equally to these claims.   We think they are destitute of patentable novelty.

Another group of claims are those relating to the trailing trolley and relative arrangement of trolley switches and branch switches. Those in controversy are as follows:

"(4) The combination of a track having switches, an overhead conductor above the track and having switches, and a car on the track provided with a contact-carrying arm arranged to engage the conductor at a point in rear of the front wheels of the car."

"(20) In an electric railway, the combination, with an overhead switch-plate having depending ribs, but open at its extremities, of main and branch conductors extending from its two extremities, respectively, a vehicle, an upwardly pressed contact arm attached to the vehicle, and tending to move laterally therewith, and a track switch for the vehicle, located so as to operate in advance of the conductor switch."

"(23) The combination, with branching overhead conductors, of a vehicle having a laterally swinging contact arm pressed upward to engage the conductors, and a switch plate at the branching point having depending sides, but open at its extremities, the interior width of the plate between the sides being greater than the thickness of the contact wheel, whereby the wheel is free to move laterally with relation to the main conductor, and engage one of the branching conductors."

"(25) In a branching electric railway, the combination of a track switch, an overhead conductor switch, and a vehicle having a rearwardly extending contact arm, whereby the track switch will operate in advance of the conductor switch.

"(26) In a branching electric railway, the combination, with a vehicle, of a track switch, an overhead conductor switch, and a contact arm extending upward from the vehicle to the conductor, and so located relatively to the length of the vehicle and the two switches that the lateral movement of the vehicle will give a corresponding movement of the contact device on the conductor switch.

"(27) In a branching electric railway, the combination, with a vehicle, of a track switch, a contact device consisting of a trailing, spring-pressed arm, having a grooved contact piece embracing the conductor, and guided thereby, the said arm being jointed to the car, and tending to move laterally therewith, and an overhead conductor switch adapted to engage the contact piece, and whereby the extremity of the arm is flexibly guided from main to branch conductor."

The arrangement of the track switch in such relation to the conductor switch and the interposed trolley that the movement of the forward part of the car upon the branch track will deflect the trolley wheel, and guide it naturally into the proper compartment of the conductor switch, is an important feature of the invention. It effects such a co-operation of the parts as to utilize the initial lateral movement of the car itself as the means for determining the directive action of the conductor switch, and thus renders the switching operation an automatic one. The description necessarily calls for the location of the track switch somewhat in advance of the conductor switch, or of the trolley, so as to engage the conductor in rear of the forward part of the car, sufficiently so as to impart the necessary directive action to the trolley wheel as it enters the conductor switch. The value of this simple arrangement, by which the manipulation of the trolley by an attendant upon the cars is no longer necessary, is obvious. It has been universally adopted, and has required no improvement since its introduction into electric railways. These facts sufficiently attest the patentable novelty of the invention of the claims.

Claims 32 and 33 of the patent relate to the centralizing spring which controls the lateral movement of the trailing trolley arm. This division of the invention is described in the specification as follows:

"E is the traveling contact wheel, and F is a hinged arm supported upon a post, f, secured to, or extending upward from, the roof of the car. To the lower end of the arm, F, is attached a spring, G, to the lower extremity of which is secured a cord, which passes downward through suitable grooves, or over suitable rollers, and is provided with a weight, H, which serves to hold the spring down and keep the contact wheel, E, always pressed up against the under side of the conductor, D. At the same time the spring will instantly yield to allow the wheel to pass under the switch or any obstruction, and while the arm, F, is movable laterally with respect to the vehicle, the spring and weight will constantly tend to restore the arm to its normal central position, and assist in causing the contact arm to partake of the lateral movement of the vehicle."

The claims are as follows:

"(32) In an electric railway, the combination, with an overhead conductor and a vehicle, of a trailing contact arm guided at its outer end by the overhead conductor, and movable laterally relatively to the vehicle, but having a normal centralizing tendency by means of a spring or weight.

"(33) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device consisting of an upwardly pressed trailing arm having a grooved contact wheel at its outer end, by which it is guided by the conductor; the said arm being free to swing laterally relatively to the vehicle, but tending to remain in its normal central position by means of a spring or weight."

It is not contended for the defendant that these claims do not cover patentable inventions.

Another group of claims are those relating to the combination of the pivoted trolley arm, and its weight and spring mechanism. These claims are founded upon the extract from the specification just quoted, and are as follows:

"(15) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a contact-carrying arm pivotally supported on top of the car, and provided at its outer end with a contact roller engaging the under side of the suspended conductor, and a weighted spring at or near the inner end of the arm for maintaining said upward contact, substantially as described.

"(16) In an electric railway, the combination of a car provided with a pivoted arm, as F, having a contact at its outer extremity, a tension spring, as G, attached at its inner extremity, and a vertically moving weight connected to said spring for holding the same in operative relation to the arm throughout its entire range of movement, substantially as described.

"(17) In an electric railway, the combination of the car having suitably pivoted arm, F, carrying a contact wheel at its outer extremity, a spring, G, secured to its lower extremity, and a connection extending from said spring, and provided with a weight at its lower end, substantially as described."

The court below held that these claims were not infringed, and that part of the decree is the subject of the appeal by the complainant. We think the conclusion of the court below was plainly right. Judge Coxe said:

"One of the elements of the claims is a 'weighted spring,' or, as it is expressed in claim 16, 'a vertical moving weight connected to said spring,' and in claim 17 'a connection extending from said spring, and provided with a weight at its lower end.' The function of the 'weight, H,' is pointed out with care in the description. Defendant does not use this weight in any manner whatever, and consequently does not infringe."

It is the function of the weight to hold the spring down, and give to the contact wheel a greater range of action. The claims are too explicit to be altered or enlarged by the omission of the weight. The spring itself could as reasonably be eliminated as the weight.

It is insisted for the defendant that the claims which we have thus far concluded to be valid, and to have been infringed, are void because their inventions were previously patented by the same inventor.

The only patents of Van Depoele which preceded the patent in suit, and which describe and illustrate devices of the same general character, are six in number, viz.: No. 394,039, dated December 4, 1888; No. 397,451, dated February 5, 1889; No. 402,117, dated April 23, 1889; No. 408,638, dated August 6, 1889; No. 409,156, dated August 13, 1889; No. 424,380, dated March 25, 1890.

All of these patents were granted to him while the application for the patent in suit was pending in the patent office, and on applications which were filed after the date of the original application for the patent in suit.

In the argument at the bar, No. 397,451 has been treated as the most important of these patents. The testimony of the expert witness for the defendant was exclusively confined to an analysis of that patent. It is relied upon to defeat the switch-plate claims, and the claims relating to the centralizing spring. It does not affect the claims relating to the directive action of the switch track, nor, so

far as we are able to discover, in the absence of any expert testimony in regard to them, do any of the others of the preceding patents. The considerations which will control the effect of No. 397,451 are equally pertinent to the other patents. For these reasons it will not be necessary or profitable to consider them.

Upon cross-examination the expert for the defendant testified as follows:

"Question. I notice that in referring to Van Depoele's earlier patent, No. 397,451, in connection with the various claims of the patent in suit, you have been quite careful to say that you find the combinations of the several claims of the patent in suit 'shown and described in the earlier patent.' You have nowhere said, I believe, that you find any one of the combinations covered by the claims of the patent in suit to have been claimed in the earlier patent. Do you, in fact, find any one of these combinations to have been claimed in patent 397,451; and, if so, please indicate what one, or, if more than one, what ones?

"Answer. I do not think any of the combinations that are claimed in 424,695 are also claimed in 397,451. Patent 397,451 contains apparently limited claims, while patent 424,695 contains broader claims, or claims which are less restricted than the claims of the earlier patent.

"Question. Do you find in the earlier patent, No. 397,451, any claims which would necessarily include the apparatus or the construction which is shown and described in the patent in suit, No. 424,695?

"Answer. The situation is the reverse, as I understand it. The claims of 424,695 include the apparatus shown in patent 397,451, but the claims of 397,-451 do not cover the devices of 424,695."

This evidence was not objected to, and is recited merely because it is a plain and concise statement of the opinion of the expert as to the true scope of the claims of the two patents.

The argument for the defendant is that the patent in suit merely claims the matter of the earlier patent more generically, or in broader terms; that it selects and withdraws fundamental parts of the combinations claimed in the earlier patent, without which those combinations could not exist, and patents them again; and that the inventions, because inseparably involved in the patented matter of the earlier patent, are covered by it.

The principles of law applicable to the case may be briefly stated. An inventor, by describing an invention in a patent granted to him, does not necessarily preclude himself from patenting it subsequently. His omission to claim what he describes may operate as a disclaimer or an abandonment of the matter not claimed; but it has no such effect when it appears that the matter thus described, but not claimed, was the subject of a pending application in the patent office by him for another patent. This was explicitly adjudged in Suffolk Co. v. Hayden, 3 Wall. 315, and recognized as sound doctrine in the Barbed-Wire Case, 143 U. S. 275, 12 Sup. Ct. 443, 450. The invention secured by a patent is that which is secured to the patentee by the claim. The claim is a statutory requirement prescribed for the purpose of making a patentee define what his intention is so distinctly and exactly as to apprise other inventors, and the public, what is withdrawn from general use. The claim, however, is to be read in the light of the description contained in the specification, and its literal terms may be enlarged or narrowed accordingly, but not to an extent inconsistent with their meaning. Identity of language in the claims of

two patents does not necessarily import that the invention patented by each is identical, nor does a difference in phraseology necessarily import that they are for different inventions. The test of identity is whether both, when properly construed in the light of the description, define essentially the same thing. When the claims of both cover and control essentially the same subject-matter, both are for the same invention, and the later patent is void.

A machine or structure may embody several different inventions. There may be subcombinations in a machine which are new and useful, and operate conjointly to perform some subordinate function. Such a subcombination, if not patented by a claim, might be appropriated by another without infringing a patent for the machine. Being for a different invention, it is the proper subject of a distinct patent. While two or more inventions residing in the same combination or structure may be covered by a corresponding number of claims in a single patent, the law does not require them all to be claimed in the same patent, and the inventions may, at the option of the patentee, be secured by different patents. It is quite immaterial that both inventions originate at the same time, and from a single conception. In Cochrane v. Deener, 94 U. S. 780, the court said, "One invention may include within it many others, and each and all may be valid at the same time." In all such cases, if the inventions are truly separable, the inventor is entitled to a monopoly for it, although neither could have been discovered and made available without the other. The invention of a new art, machine, or manufacture, and the invention of an improvement upon either, are substantially distinct and separate; and because this is so the order of priority between patents to the same inventor for the different inventions, in the absence of abandonment or disclaimer, is immaterial. These various propositions may be summed up by adopting the language of the court in Miller v. Manufacturing Co., 151 U. S. 198, 14 Sup. Ct. 310:

"The result of the foregoing and other authorities is that no patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ; that the second patent, although containing a broader claim, more generical in its character than the specific claims contained in the prior patent, is also void; but that where the second patent covers matter described in the prior patent, essentially distinct and separable from the invention covered thereby and claims made thereunder, its validity may be sustained. In the last class of cases it must distinctly appear that the invention covered by the later patent was a separate invention, distinctly different and independent from that covered by the first patent; in other words, it must be something substantially different from that comprehended in the first patent. It must consist in something more than a mere distinction of the breadth or scope of the claims of each patent."

Some observations in Miller v. Manufacturing Co. seem to have created some misapprehension of the scope of that decision on the part of the profession, but the principles enunciated in the opinion are so plainly stated that those observations, when considered in their application to the case before the court, ought not to be misconceived. The court decided in that case that the two patents to Wright were in fact for the same invention, and consequently the later patent was void. The invention of Wright, and his only in-

vention, consisted in a spring of a peculiar construction, designed to be used with cultivators having vertically swinging beams. Previous to his invention, as both the patents state, springs had been applied to such cultivators to assist in lifting the beams, and Wright's entire invention consisted in a peculiar construction of such springs. He attempted to patent the same spring in combination with the same elements in both patents. The court said of the patents:

"The patent of 1879 thus embraces both the lifting and the depressing effects or operations of the spring device, while that of 1881 seeks to cover only the increased lifting effect of the same device. The first patent clearly includes the second. No substantial distinction can be drawn between the two which have the same element in combination, and the same spring arrangement and adjustment to accomplish precisely the same lifting effect, increasing as the beams are raised from their operative positions. The matter sought to be covered by the second patent is inseparably involved in the matter embraced in the former patent, and this, under the authorities, renders the second patent void."

The opinion treats the case as one where the patentee, having described and claimed a spring which was capable of performing two functions, attempted to patent it again as one capable of performing only one of the two functions. That the court regarded the second patent as merely for one of the functions of the device patented in the first patent,—in other words, as for a different use of the same invention,—is indicated by the following language in the opinion:

"The prior invention covered the means, and the only means, by which the results sought by the patent of 1881 were to be accomplished; and it is settled that the patentee of such prior device would be entitled to all of its uses, whether described or not. Roberts v. Ryer, 91 U. S. 150; Stow v. Chicago, 104 U. S. 547. Under these authorities, a single element or function of a patented invention cannot be made the subject of a separate and subsequent patent; and it therefore follows that this increased lifting effect of the spring device sought to be covered by the 1881 patent, being clearly shown and described in the specification, drawings, and claims of the 1879 patent, was not the subject-matter of a valid patent."

The general question under consideration was before this court in Electrical Accumulator Co. v. Brush Electric Co., 2 C. C. A. 682, 52 Fed. 130. In that case the patent in suit (No. 337,229) was applied for June 13, 1881, but, owing to an interference proceeding, was not issued until March 2, 1886. Meanwhile a division of this application was applied for June 15, 1882, and patented July 4, 1882, in letters patent No. 260,653. Upon this division a number of the specific features of the general invention were selected, claimed, and patented. These features consisted of the subordinate invention in which the plates were constructed with shelves or "étagères" for holding active or absorptive material. It was urged that this patent invalidated the later patent, because it described the broad invention claimed in the later patent, and claimed certain parts of it. The court, referring to this argument, said:

"No. 260,653 stated on its face that it is a division of Case I, in which other features of the invention were claimed, so that the public was not misled into the idea that unpatented portions of the invention had been abandoned. The specification, although the broad invention is described, and the claims

show that the patent is for the étagère-like form or series of shelves in which the finely-divided lead of Case I was held. If letters patent were to be treated by courts in the critical and hostile spirit which a plea in abatement formerly encountered, the contention of the defendant would have technical importance, but courts do not construe letters patent for the purpose of their destruction. The history of No. 260,653 entirely contradicts the theory of its breadth. The broad invention was the subject of Case I. Pending its consideration in the patent office, a subordinate claim became the subject of interference, upon which a patent was issued, which proclaimed its divisional character. Subsequently the patents were issued upon the broader claims which had lingered in interference in the patent office, and it is now contended that the main invention has been, in fact, included in the claim for a series of shelves which held finely-divided lead. Such a construction is not demanded by decided cases, or by known principles of law, and a limited construction, in accordance with its apparent scope, will therefore be placed upon No. 260,653."

Applying the principles which have been stated to the case in hand, its solution is not difficult. In patent No. 397,451, although the elements of the claims of the later patent relating to the switch box and centralizing spring were described and illustrated, the inventions claimed were distinctly and specifically for structural improvements in the devices patented in No. 424,695. The switch claims all relate to special supplementary improvements in the form of switch plates which enable the trolley to pass into the switch, and, without binding in turning a sharp curve, to follow with certainty the proper branching conductor. The trolley claims relate to certain special and supplementary features which make the trolley arm adjustable as to length, or adjustable as to tension. As the expert for the defendant stated, its claims, so far as they relate to the switch and to the trolley, do not cover the devices of No. 424,695. They cover the improvements, and nothing more.

These conclusions lead to a reversal of the decree, with costs of the appeal to be paid by the complainant. Upon filing a proper disclaimer as to the claims which, according to our judgment, are void, the complainant will be entitled to a decree for an injunction and accounting in respect to those which we have held to be valid and infringed, but without costs of the suit.

The decree is accordingly reversed, and the cause remitted to the circuit court with instructions to proceed conformably to this opinion.