## VAPOR CAR HEATING CO., Inc., et al. v. GOLD CAR HEATING & LIGHTING CO.

## VAPOR CAR HEATING CO. v. SAME.

(District Court, S. D. New York. May 3, 1920.)

1. Patents ⊚⇒328—Gold, No. 758,436, for steam heating equipment for railway cars, claims 10, 11, and 12, held void for anticipation and lack of invention.

The Gold patent, No. 758,436, for a vapor system of heating railway cars, claims 10, 11, and 12, *held* void for anticipation and lack of invention.

2. Patents ⊚⇒328—Gold, No. 768,019, for heating equipment for railway cars, claim 6, held infringed.

The Gold patent No. 768,019, relating to heating equipment for railway cars, by the vapor system, claim 6, *held* infringed.

3. Patents ⊚⇒163—Disclosure of invention to public by receipt of patent does not affect copending applications of patentee.

When an applicant receives his patent, the monopolies or inventions are embodied in his claims, and the disclosure in all its parts he transfers over into the public demesne; but this dedication does not affect other applications by him which may be pending at the same time.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

**4. Patents** ⚙➞120—**On copending applications generic claims may be granted last.**

When a patent has issued, no subsequent claim by the patentee can be valid for the same invention; but if the claims be different, and the applications are copending, it makes no difference in which of the two applications the broader claims appear, and the generic claims may issue last, unless they were for the first time introduced into the application after the first patent issued.

**5. Patents** ⚙➞328—**Gold, No. 944,187, for steam-heating equipment for railway cars, claims 12 and 20, held not infringed.**

The Gold patent, No. 944,187, relating to steam-heating equipment for railway cars, claims 12 and 20, limited as they must be to avoid anticipation, *held* not infringed.

**6. Patents** ⚙➞328—**Gold reissue, No. 13,059, for steam-heating equipment for railway cars, claims 18 and 19, held valid and infringed.**

The Gold reissue patent, No. 13,059 (original No. 890,138), relating to steam-heating equipment for railway cars, claims 17 and 21, *held* void for double patenting; claims 1, 6, and 7 *held* valid and infringed; and claims 18 and 19 void, as not within the disclosure of the original patent.

**7. Patents** ⚙➞328—**Gold, No. 925,896, for steam-heating equipment for railway cars, claim 5, held invalid, and claim 8 not infringed.**

The Gold patent, No. 925,896, for an attachment for steam-heating equipment for railway cars, claim 5, *held* invalid, and claim 8 not infringed.

**8. Patents** ⚙➞289—**Suit for infringement held not barred by laches.**

Delay in bringing suit for less than the term of the statute of limitations *held* not such laches as to bar a suit for infringement, in the absence of some ground of estoppel.

In Equity. Suit by the Vapor Car Heating Company, Inc., and Egbert H. Gold and by the Vapor Car Heating Company against the Gold Car Heating & Lighting Company. Decree for complainants in part.

The first of these suits was filed on January 12, 1916, and was brought upon five patents, of which one was withdrawn pending the suit. The four remaining patents were granted to Egbert H. Gold, as follows: 768,019 was applied for January 11, 1904, and granted on August 16, 1904. 925,896 was applied for January 30, 1905, and granted on June 22, 1909. 944,187 was applied for January 27, 1905, and granted on December 21, 1909. Reissue patent 13,059 was applied for August 13, 1909, and was granted on December 21, 1909. The original of this patent No. 890,138, was applied for on May 21, 1906, and was granted June 9, 1908. The claims in suit are the following: Claim 6 of patent 768,019. Claims 5 and 8 of patent No. 925,896. Claims 12 and 20 of patent No. 944,187. Claims 1, 6, 7, 8, 11, 17, 18, 19, and 21 of No. 13,059.

The bill in the second suit was filed November 29, 1918, and was brought upon patent No. 758,436, which was applied for on August 25, 1903, and granted April 26, 1904. Claims 10, 11, and 12 of that patent are in suit.

All the patents concern steam-heating equipment for railway cars. Patents 758,436 and 768,019 are patents for the "vapor system," in which the steam in the radiators is always at atmospheric pressure; the admission of steam from the locomotive being regulated by a valve at the inlet end of the radiator system. The other patents concern the so-called "convertible system," by which at will by a hand-operated valve the system can be used as a "vapor system," or as a high-pressure system. In the high-pressure system the steam in the radiators is at train-pipe pressure. The outlet of the radiator under those circumstances must be closed to prevent the escape of steam, but must also be capable of being opened to let out the water of condensation.

⚙➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This is accomplished by a steam trap or drip pipe, controlled by a valve and thermostat, which alternately opens and closes as water of condensation forms at the outlet end of the radiator system.

The defendants attack all the patents for noninfringement and invalidity and object to any decree in the first suit upon the ground of laches. The other facts appear in the opinion.

The prior art patents referred to in the opinion are: Brinckerhoff, United States patent No. 304,695, September 9, 1884; Cleuet, French patent No. 180,961, January 18, 1887; Weber, United States patent No. 403,162, May 14, 1889; Tudor, United States patent No. 618,921, February 7, 1899; Kampf & Webers German patent No. 117,850, February 15, 1900; Heintz, French patent No. 327,061, December 6, 1902; Hill, United States Patent No. 502,-563, August 1, 1893; E. H. Gold, United States patent No. 771,628, October 4, 1904.

Otto Raymond Barnett, of Chicago, Ill., for plaintiff.

William A. Redding and Arthur C. Fraser, both of New York City, for defendants.

Patent 758,436.

LEARNED HAND, District Judge (after stating the facts as above). [1] The claims in suit are 10, 11 and 12. All are infringed by the defendant's vapor valve, *1112*; the median diaphragm does not prevent the valve from being open to the atmosphere. Therefore the case turns upon validity. Let me ignore for the moment claims 11 and 12 and consider claim 10. Cleuet and Tudor had both shown devices for regulating the inlet of steam into a radiator system by a thermostat controlled by the exhaust steam. The basic idea, so far as there was one, had therefore been discovered, and Gold has no claim to it. His success must depend upon something else. Weber showed the same idea; the thermostat being situated in the discharge chamber. He had, however, a combination of steam trap and inlet valve which he thought to regulate simultaneously by a single thermostat, apparently to establish an intermediate pressure. Had he indicated that the thumb nut, $G'$, might be moved to lift the valve on the shaft, $o'$, permanently out of operation, claim 10 of the patent in suit would be clearly invalid. Weber did not do so, and the Examiner allowed this claim, as well as claims 11 and 12, because for this reason Weber did not show a thermostatic chamber open to the atmosphere. In so ruling he was in direct opposition to all those rulings which eventually deprived E. E. Gold of his patent for the interchangeable system, since these all proceeded upon the theory that Weber could be made to operate either as a pressure or a vapor system by mere manipulation; i. e., that Gold's patent was for a new use of Weber. At the time of his ruling this idea, which afterwards controlled in all courts, had not apparently occurred to the authorities. It arose only after the interference of Gold v. Gold v. Cosper had been decided, seven or eight years after patent 758,436 issued. If the final attitude of the Patent Office was right, claim 10 in the case at bar is also invalid, because the greater includes the less. E. E. Gold would not have lost his patent, unless Weber included both a vapor and a pressure system. I should not have any question whatever that I should follow these rulings, except that in affirming the decree below in Gold v. Newton, 254 Fed. 824, 166 C. C. A. 270, the opinion of the Circuit Court of

Appeals said obiter that a majority of that court thought that E. E. Gold's patent was good, and yielded only because of the difference of opinion in that court and of the great body of prior decision the other way. Gold v. Newton, 254 Fed. 824, 166 C. C. A. 270. That body of opinion is said not to be authoritative, as this case arises, especially since the Examiner has here found with the patentee. However that may be, it appears clear that this patent is invalid independently of Weber, and I shall therefore ignore my own ideas on that subject, in deference to the intimation in the opinion in Gold v. Newton.

The Examiner, though he allowed the claim over Weber, did so only because the exhaust was open to the atmosphere, in the sense that there was no effort to establish an intermediate pressure in the radiator, as Weber tried to do, effectively or ineffectively. In both Cleuet and Tudor such a valve was absent, and they failed to anticipate only because the thermostat was not inclosed within the chamber. Both of these limitations were therefore necessary to claim 10. I should have a great deal of doubt whether the mere omission of the drip valve of Weber was invention, but that point I pass. Assuming that it was a good distinction, the question is whether two other patents, Kampf & Weber and Heintz, do not anticipate; neither of these having been before the Examiner. Heintz clearly has both features, because he says that the thermostat "is in communication through $k$ to the open air." Moreover, the thermostat is mechanically within the "fluid conduit," or "the outlet chamber," in the sense that the specification means (page 2, lines 110–126). The only possible question is whether it is functionally so situated. This in turn depends upon whether in operation the exhaust steam comes into contact with it, and this finally turns upon the somewhat baffling operation of Heintz's "injector." If his disclosure is to be taken as it reads, the patent is a complete anticipation of claim 10. The fact that the thermostat is affected by a mixture of exhaust steam and air, instead of steam, is of no consequence, provided it can be set to cut off the supply when the radiator can condense no more of the steam admitted. Precisely that is the point of the plaintiff's attack.

It must be admitted that the question is not simple, yet I think that the operation can be understood. Let me suppose that the system is already in operation, and that the inlet valve is open. In that case Mr. Reeve, whose opinion is always entitled to much weight, agrees that there will always be some suction—though it may be only a very gentle one—at the mouth, $x$, of the nozzle, $m$, from which, of course, it follows that gas of some sort, air, or steam, or air and steam will be drawn into the thermostat chamber. Even though the balance be so perfect between supply to, and condensation by, the radiator system, that no steam will emerge, there will be a change of gas in the thermostat chamber. If the radiator condenses all the steam, the suction must be of air, and the valve will remain open, as it should. If steam emerges at $g$, then it will either be sucked up with air into the thermostat chamber, mixed or unmixed with air, or, if it be in large enough volume, it will divide at the by-pass and part go into that

chamber as pure steam at atmospheric pressure, and part blow-off through $k$. In either event the temperature of the chamber will be raised above that of the air. It will, of course, vary with the temperature of the air and the proportions of steam to air of which the mixture is composed, but it will always be higher than air.

If the thermostat be set so as to close the inlet valve at a relatively low temperature, it will, of course, close at all higher temperatures. As soon as uncondensed steam emerges at $g$ and is mixed with air, it will close the valve, unless the air be so cold and in such quantity as to reduce the mixture below the critical point selected. It is true that the mixture will vary in heat, and that to close the valve more steam must emerge at one time than another; but the thermostat may still be set only for a temperature safely higher than any possible atmospheric temperature, e. g., 130° F. In very cold weather it might take considerable steam to raise the air sucked in to that heat; that would indeed result in delaying the automatic closing of the valve, depending upon how great a proportion of air was mixed with the steam, but it would certainly close if the valve continued open. It would perhaps waste more steam than a system in which the unmixed steam directly operated upon the thermostat. It would in short be a somewhat awkward and clumsy device, like most early inventions; but it would embody the invention, unless that is defined as one in which unmixed steam must reach the thermostat. That is not the invention of claim 10. Furthermore, the action of the injector is confessedly spasmodic and feeble, and there indeed is some dispute as to whether it sucks in air at all. When it does not, no air comes in; but the steam will, nevertheless, reach the thermostat quite as freely as in patent 944,187. During the period when the injector is inactive Heintz falls well within the specifications (page 2, lines 110–126), and if there are such periods, the machine will operate at times anyway exactly as some of E. H. Gold's apparatus. He is hardly in a position to assert that at no time can it be an anticipation, but he must do so to escape its result.

It is quite true that the injector feature proved useless, perhaps worse than useless; but the principle was there, and it would operate, though on occasions it would result in a wasteful method of operation. All that E. H. Gold could at most have got, had Heintz been known at the time, was a patent for an improvement depending upon the omission of the injector. The idea in actual application was all present, and went into substantial use when the injector feature was eliminated. I think this patent a valid anticipation of the broad monopoly asserted by claim 10.

The other patent is that of Kampf & Weber. This is of exactly the same type as the patent in suit, except so far as the opening of the discharge pipe, $k$, may be thought doubtful. The specification repeatedly speaks of it as a discharge pipe, a term which normally would involve an opening to the air. In case of water heating, probably this is not so, and the patent includes water heating. It is probable that the pipe would then lead again to the supply after passing through a heater. In the case of air, the discharge could not be connected to the heater, as the hot air would be forced back into the discharge, if it

were. It must have an outlet to the atmosphere, if it is not to be kept at greater than atmospheric pressure. There is no possible reason that I can see to assume any impediment to its escape. The same considerations apply to steam, with the addition that the steam will for the most part condense anyway, and the water must find a way out, or it will clog the system. Weber did have such a valve, but apparently had never conceived of his apparatus as a vapor system at all, but as an "intermediate" system. Be that as it may, his outlet valve was certainly there for some purpose connected with establishing pressures in the radiator, and it was indeed only for that reason that his patent is not clearly an anticipation. Now, it is equally clear that we must assume that Kampf & Weber was a vapor system, because, had they intended to establish pressures in the radiator, it is inconceivable that they should have omitted all reference to the necessary valve or trap. If so, no possible ground exists for interposing any obstacle to the outflow of the condensed water, which created the difficulties in pressure systems solved by the old steam traps. They omitted any such reference, because, I think, it was thought too obvious to require description, once you had conceived a vapor system. So the criticism upon this feature of the disclosure appears to me unwarranted.

As to the operability of this patent, Mr. Reeve, it is true, does suggest that the packing might have to fit the valve stem too snugly to allow the valve to move freely. Yet the two pressures which cause it to move are high—one, the expansibility of the liquid; the other, the pressure of the supply steam. It is perhaps true that the expansibility of the liquid will be difficult to adjust nicely; but it would be no trouble whatever, if that were true, to have a compensation in the shaft of the valve to take up extreme pressures of the valve upon its seat. As to the resultant between the opposing expansion of the metal and the liquid, it is hardly necessary to do more than observe that the expansion of the liquid is proportional to its volume, like a thermometer. I see no reason whatever to question the operability of this particular illustration, and, indeed, Mr. Reeve does not say that it is inoperable. Moreover, the patent mentions the liquid thermostat as only one kind, and speaks of a metal rod as another. Such thermostats were thoroughly well known at the time; Brinckerhoff, Figure 4, Weber. The patentees made an adequate disclosure by mere mention of a device as applicable which the art understood. So to read the patent is not to add to it a new element, but only to give it the express scope claimed for it.

Therefore, granting that Weber's patent is not of itself enough, as I should have been disposed to hold, were it not for the intimation of the Circuit Court of Appeals in Gold v. Newton, these two patents seem sufficient to anticipate. I may add that there would be an unhappy irony in depriving E. E. Gold of his patent because of Weber, and yet enjoining him in this case in spite of Weber, for, as I have said, if Weber was an anticipation of the interchangeable system, ex vi termini it was an anticipation of the vapor system.

Nor do I think that one can safely assume the validity of claim 10 from the success of Gold's vapor system. That was, it is true, signal,

and clearly showed that he had something which was wanted by the art and which the art had not had. Yet it is always necessary to make sure that a given claim contains that element upon which success depended. Gold used a bouillon thermostat, and Kampf & Weber, Cleuet, and Tudor did not. Heintz did, and it was perhaps on that account that his patent succeeded with the injector eliminated. Gold took the old steam trap and made it control the supply; that was all. Each element was old, the steam trap and the control of the supply by the exhaust. I do not mean to say that there was no invention, and important invention, in that combination; but claim 10 is not limited to any such invention. It was a generic claim, covering only what was old, and it may well have been that success depended upon that distinction which differentiated the unclaimed species. The late comer usually invents the simpler device, which succeeds; but his invention should rest upon the improvements he has contributed. Having chosen to assert the broader monopoly, he necessarily ventures to 'cover all kinds of designs and of thermostats, including those which did not operate to their maximum at a critical point. If these do not operate well in such situations, as Mr. Reeve says, the fault applies equally to the claim, and cannot make a valid monopoly in broad terms merely because one illustration has turned out to be the solution. Commercial success is valid evidence of invention, but nothing is more hazardous in application. A vaguely benevolent attitude towards all machines which have gone into use has not infrequently been the source of imposing upon the art a broad monopoly to which the invention was never entitled.

Claims 11 and 12 do not seem to me to add anything new of substance. I do not distinguish between an "outlet chamber" and a "fluid conduit," especially in view of the specification (page 2, lines 110–126). The only real addition is of a more (claim 12), or less (claim 11) specific element for keeping the supply steam from leaking into the "outlet chamber." Hill's patent for a water waste valve shows the same device to prevent the leakage of a water valve. In Heintz's patent there is no packing or gasket, but the introduction of one or the other would not be invention. I find all three claims invalid.

### Patent 768,019.

[2] Claim 6 alone is involved, and is for a very slight structural detail, which is of doubtful value. It consists of the fact that the exhaust is led into the air below the car floor for some distance before the vapor reaches the thermostat. The purpose (page 2, lines 48–78) the specification sets forth in detail, and there is no showing against the validity of the patent except its supposed inutility. If there be infringement, we are not accustomed to hear a defendant insist that the patent is not useful. Really the only question is of infringement. As the defendant equips a sample car, in which he wraps all the exposed pipes, furnishes enough insulation for all equipment, and orally instructs all customers to wrap all exposed pipes, clearly the plaintiff can succeed only because of the failure to wrap the vertical traps, which are concededly not included among exposed pipes. In Figure 820 of its catalogue appears a combination pressure and vapor trap.

This has two concentric pipes; the inner one being a pressure drip, and the outer one a vapor exhaust. The exhaust leads to the thermostat of the excelsior vapor valve, and it would be rather awkward to have it on the inside, though possibly it would be feasible. Nevertheless, there is a considerable length of pipe below the floor and above the thermostat, during its flow through which the exhaust is exposed to the outside air. Diagram 38 shows the installation, and makes it reasonable to suppose that this length of pipe may have been used in order to allow the inlet valve to be at a level with the main supply pipe; yet I can see no reason why the inlet valve should not also be close to the floor and in the upright lead of pipe. Perhaps there is a good reason. However, the result in fact is that the exhaust vapor does have to pass a length of exposed pipe before reaching the thermostat, and that is really all that the claim covers. I think Mr. E. E. Gold was in error in saying that it was protected by a double casing. The pressure drip is so protected, but not the exhaust, when the regulator operates as a vapor system. The claim seems to me infringed, both by Figure 820 and by Figures 781 and 821, and the equipment shown in "Gold Dollars."

The question of laches I pass for the moment.

### Interchangeable System.

Patent 925,896.

Patent 944,187.

Reissue 13,059 (original 890,138).

In order to deal satisfactorily with the extremely complicated situation created by this tangled mass of patents, prior patents, and interferences, I think it will be best to lay aside, as can very easily be done, a number of the claims in suit. I may, for brevity, accept the terminology of the parties and call patent 944,187 the "one-outlet" patent, patent 925,896 the "two-outlet" patent, and reissue 13,059 the "attachment" patent. E. H. Gold's patent 771,628 I shall for convenience call the "intermediate" patent, meaning that it was designed to create intermediate pressures in the radiators.

[3] The relevant law is not complicated, and is, I think, wholly consistent and logical. It all proceeds upon the doctrine, thoroughly well settled, that, when an applicant receives his patent, the monopolies or "inventions" are embodied in his claims, and the disclosure in all its parts he transfers over into the public demesne. However, this dedication does not affect other applications which may then be pending at the time, because that cannot, of course, be his purpose, and because it would be unjust to impose upon him the equivalent of such a purpose. Akin to this doctrine, and running along with it in the books, is the doctrine that two patents—i. e., two claims—cannot exist side by side for the same invention, and that the earlier claim alone is valid. Miller v. Eagle Mfg. Co., 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121.

[4] This being so, it follows that, when a patent once has issued, no subsequent claim can be valid for the same invention, and by invention we are not bound verbally by the claims, but we read them with the specifications, to see what they really mean. Thomson-Hous-

ton El. Co. v. Hoosick Ry. Co., 82 Fed. 461, 27 C. C. A. 419 (C. C. A. 2d). If the claims be different, and the applications be copending, it makes no difference in which of the two applications the broader claims appear. Suffolk Mfg. Co. v. Hayden, 3 Wall. 315, 18 L. Ed. 76; Century El. Co. v. Westinghouse, etc., Co., 191 Fed. 350, 352, 112 C. C. A. 8 (C. C. A. 8th); Elec. Co. v. Brush El. Co., 52 Fed. 130, 138, 2 C. C. A. 682 (C. C. A. 2d); Thomson-Houston El. Co. v. Elmira, etc., Co., 71 Fed. 396, 18 C. C. A. 145 (C. C. A. 2d); Badische, etc., v. A. Klipstein & Co., 125 Fed. 543, 554 (C. C. S. D. N. Y.). Therefore the generic claims may issue last, unless they be for the first time introduced into the subsequent patent after the first have issued, when it has been held that they are void. Union Typewriter Co. v. Smith (C. C.) 173 Fed. 288. It is not clear when the generic claims were introduced into the later patent in Morse Chain Co. v. Link Belt Machinery Co., 164 Fed. 331, 90 C. C. A. 650 (C. C. A. 7th). If before the specific patent issued, with deference I should doubt its authority in the Second Circuit.

With this law in mind, as all these applications were copending, it is clear that I need not concern myself with anything more than the question how far they cover the same invention, except, perhaps, the reissue claims of the "attachment" patent, which were applied for after the "two-outlet" patent issued. It appears that all the claims in suit upon the "one outlet" and "attachment" patents must be read upon some specific feature, or they will be void for double patenting. I must take them up seriatim.

[5] Claim 5 of the "two outlet" patent is specifically for a "two-outlet" device—the first, the conventional automatic steam trap; the second, the vapor valve. There is added "means for cutting * * * out of operative relation" the vapor valve. Claim 12 of the "one-outlet" patent, if read to cover two outlets, has exactly the same elements and is void; therefore it must be read on the disclosure, and the defendant nowhere infringes. In claim 20 of the same patent the concluding phrase is "means independent of said thermostat for closing said outlet." If this means the ordinary steam trap, as it must do to cover in the case at bar, it is the same as claim 12. Whether it does or not, defendant cannot infringe. Therefore the "one outlet" patent may be disregarded.

[6] Coming next to claim 1 of the "attachment" patent, it is clear that, to differentiate from claim 5 of the "two-outlet" patent, the "attachment" must be to the "trap"; it must be physically annexed to the drip pipe or trap, as disclosed. In claim 6 there must be "a casing," which necessarily means "a casing" for the "trap," because the patent presupposes an original casing, 16, partly cut away, which serves as a warming-up case during blow-off. Without it there would be no distinction from claim 5 of the "two outlet" patent. The same is true of claims 7, 8, and 11. Claims 17 and 21, in view of the variants upon the specific device contained in the other claims, cannot be treated otherwise than as broad claims, in which the "vapor valve" and thermostat are not attached to the trap or drip pipe at all. If so construed, they read on claim 5 of the two-outlet patent, and are void for double patenting. Claims 18 and 19 are specific, requiring

the blow-off pipe to surround the trap. That would, I think, be an invention, and will save these claims, if not invalid, because a departure from the original invention.

Coming next to infringement, I shall consider first the attachment patent. I find that the defendant's Figures 821 and 822, and the figure on page 10 of "Gold Dollars," infringe claims 1, 6, and 7, and necessarily also the reissued claims 8, 11, 18, and 19. The only question which can arise is whether the "inlet chamber" is attached to the "casing." In these structures it is a part of the casing itself, as is best shown in Figure 781 of the vapor valve. Figures 821 and 822 presuppose the same structure as they expressly state. This infringement, therefore, carries with it diagrams 37 and 40. As this equipment infringes the original claims, it does not raise the question of the reissued claims.

Claims 1 and 7 require "a casing having therein a valve chamber"; claim 6 requires "a casing attached to, and having chambers in communication with, * * * the inlet end"; claim 8 requires an "attachment comprising a valve chamber." In claim 11 the word "means" must be read "casing," else it reads upon the "two-outlet" patent. If so, it adds nothing to the earlier claims. None of these claims can therefore cover any of the "coil thermostat" equipments, in none of which is the inlet chamber mounted on the attachment. Nevertheless, claims 18 and 19 will cover those equipments with "coil thermostats," in which the coil surrounds the drip pipe or trap, because they were certainly drawn for that purpose. The element is omitted requiring the inlet chamber to be mounted on the "casing" or "attachment," and the omission must be treated as significant. I have no doubt it was drawn to cover the "coil thermostat." But claims 18 and 19 will not cover any "coil thermostat" equipments in which the trap or drip pipe is not so surrounded, because it is clear (page 1, lines 93–106; page 2, lines 1–30) that Gold's "attachment" presupposed a "blow-off" pipe which could warm up the trap. Therefore I find that diagrams 24, 25, 28, 31, and 34 infringe claims 18 and 19, and only these, and that diagrams 21, 26, 29, 32, and 35 do not infringe any claim.

[7] Returning now, to the "two-outlet" patent, it seems to me impossible to distinguish claim 8 from claim 5, except by reading the last clause as incorporating the three-way cock, *24*. In all the defendant's devices the trap is always in operative relation. I do not forget that when operating as a vapor system the trap is said to be always open. That is not what the patent had in mind. Nothing probably turns on this claim, but nevertheless I find claim 8 not infringed.

Claim 5 of the "two-outlet" patent I find infringed by the coil thermostat in combination with a trap, and, of course, by such equipments as diagrams 37 and 40. Similarly, it is, of course, not infringed by vapor valves like *1112*. It will not be necessary to go over all the different devices covered by this claim. As a result, therefore, I find infringed claim 5 of the "two-outlet" patent and all the claims in suit of the "attachment" patent.

There remains the question of validity. The plaintiff has always steadfastly denied that the "two-outlet" patent was for the broad in-

vention of interchangeable control, being forced to do so because there was copending his application, 245,311, which eventually came into interference with E. E. Gold's application. He regarded this application, 245,311, as the basic one, and no doubt it was. Yet I do not see how any claim could cover an interchangeable system more generally than claim 5, except that it need not have two outlets, a limitation which in my judgment did not constitute a patentable invention.

This claim (original claim 8) was never objected to because of E. H. Gold's "intermediate" patent, though very clearly it presented much more closely a new use of that disclosure than the application of E. E. Gold did of Weber. This happened because Weber was not held to be an anticipation of the basic patent until after the interference between E. H. Gold and E. E. Gold had been decided in 1910, before which time the "two-outlet" patent had been granted. Eventually, however, E. E. Gold proved to have won a Pyrrhic victory, and the priority granted him in interference came to nothing, because Weber was found to be an anticipation of any basic claim. Claim 5 is as much open to objection because of Weber as was the putative invention eventually found void in Gold v. Newton—at least, if it was not anticipated, it differentiated from Weber only by having two outlets, and two outlets are shown in the "intermediate" patent. Moreover, if E. E. Gold's disclosure (which was held prior) was only a new use of Weber, claim 5 here was much more clearly a new use of the "intermediate" patent. Clearly, had the Patent Office conceived the idea that Weber anticipated the putative basic invention while the "two-outlet" patent was pending, it would never have let through claim 5 in the face of the "intermediate" patent.

I am myself altogether persuaded that this would have been a correct disposition of claim 5, but it is argued that the majority of the Circuit Court of Appeals in Gold v. Newton thought that Weber did not anticipate E. E. Gold and yielded only because of the prior decisions. So, the plaintiff says, I ought not to hold that Weber anticipates this patent, even with the "intermediate" patent added. Now, as I have said, the "intermediate" patent is much closer to a mere new use of claim 5 than Weber was to E. E. Gold's application, and the majority in the Circuit Court of Appeals did not declare that a patent could issue for any new use. That would be in the face of established law. It is perfectly clear that the screw, *32*, in the "intermediate" patent, can be backed off or wound up to any pressure (page 2, lines 61–65), and intermediate pressures necessarily include the extreme pressures.

But, regardless of all this, and treating the case as though I must follow the intimation of the majority in totally other circumstances, the result would be a parody of justice. E. E. Gold was, in fact, held to be the first inventor, outside of Weber, of the interchangeable system. He lost his patent, rightly or wrongly, because of Weber. Now comes E. H. Gold, the party adjudged junior to E. E. Gold, and succeeds in getting the same patent (the distinction being of no consequence), which was denied E. E. Gold in the face of the same Weber patent and of his own "intermediate" patent. Moreover, he so succeeds only because he got through the Patent Office, before they

changed their position as to Weber; a position which they would have changed a fortiori as to the "two-outlet" patent, because of the "intermediate" patent. Thus E. E. Gold, who won the race, was awarded the counterfeit prize, and E. H. Gold, who lost, will get the genuine.

Now, whatever the opinion of the majority of the Circuit Court of Appeals, had they the whole question de novo, there is not the slightest reason to suppose that they would countenance here any such fantastic result. Even assume that I ought to suppose, without the slightest evidence, that as res integra they would not regard the "intermediate" patent as anticipation, nevertheless, there is no reason to assume that they would at once upon the strength of authority exclude E. E. Gold from his due, as they believed it, and yet subject him to a monopoly which ought to be his own. The compunction which led them in Gold v. Newton to defer to the earlier decisions on that subject would, I believe, lead them now to maintain a consistency which is necessary to protect E. E. Gold from becoming the mere sport of the order in which he chances to meet the judges who pass upon his several causes. I think claim 5 invalid.

There remain only claims 1, 6, 7, 8, 9, 11, 18, and 19 of the "attachment" patent. The structure was new, as disclosed; it was a patentable advance on the art as it then stood, though a narrow one, and I have no doubt that it contained a valid invention, and that claims 1, 6, and 7 are good. Claims 8, 9, and 11, as I have construed them, play no part in this case, because here they cover nothing that claims 1, 6, and 7 do not cover, and the question of their validity as reissued claims does not come up. The only question which can, therefore, arise concerns claims 18 and 19. As I have construed these claims, they extend the original claims, in that they permit a casing of which the inlet chamber is not an integral part, one which is altogether disconnected, except for the fact that the copper coil of the thermostat runs to the inlet valve and operates it in that way.

The first question is whether this invention was contained in the original disclosure. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 Sup. Ct. 38, 31 L. Ed. 100; Morse Chain Co. v. Link Belt Co., 189 Fed. 584, 110 C. C. A. 564 (C. C. A. 2d). Nothing in the specifications suggests anything of the sort; throughout, especially at page 2, lines 15–30, the patentee declared that the device was one to be put on whole as an attachment to the "blow-off" pipe. It was described as complete in itself and requiring nothing but the necessary pipe connections. If the reissue is to succeed, the original patent must be held to have disclosed, at least by some imperfect intimation, not only the invention originally claimed, but an attachment comprising only the thermostat chamber; the inlet chamber being independently attached directly to the supply pipe and separate from the casing. How the two could be put into operative connection was not then, and for that matter has not since been, indicated. The only conceivable claim, therefore, which the disclosure could bear, aside from the question of reissue, would be one for an attachment carrying a thermostat chamber alone. It is enough to observe that there is no such claim. Therefore claims 18 and 19, in so far as they might be held to cover the coiled thermostat of the defendant, would be not

only a new invention, but an invention insufficiently described. I may add that the defendant had put out this device between the issue and the application for reissue. That is not a conclusive answer to the validity of the reissue (Abercrombie v. Baldwin, 245 U. S. 208, 38 Sup. Ct. 104, 62 L. Ed. 240), but it is an important consideration in cases of this sort (American, etc., Co. v. Porter, 232 Fed. 456, 462, 146 C. C. A. 450 [C. C. A. 6th]; Ashley v. Tatum, 240 Fed. 979 [D. C. S. D. N. Y.]). I conclude, therefore, that claims 18 and 19 are invalid for the two reasons given.

[8] The last question is the defense of laches. As I have only held the Excelsior vapor valve, either alone or in combination, to be an infringement of any claim, and as this first appeared in June, 1910, the delay in suing was only 5½ years. It seems hardly necessary to argue that such a delay in the absence of some other estoppel is not a good bar. Equity will follow the statute of limitations (Kelley v. Boettcher, 85 Fed. 54, 29 C. C. A. 14 [C. C. A. 8th]) in the absence of controlling circumstances. The same rule obtains in patents. Ide v. Trorlicht, etc., Co., 115 Fed. 137, 148, 53 C. C. A. 341 (C. C. A. 8th). Starrett v. Stevens (C. C.) 96 Fed. 244, and Meyrowitz v. Eccleston (C. C.) 98 Fed. 437, turned upon the fact that the patentee had had communication with the defendant, who honestly thought that he did not infringe. After 10 years' apparent acquiescence the suit was started, and that was held an estoppel. The other cases cited by the defendant affect only the question of the accounting, and in Vacuum Cleaner Co. v. Innovation El. Co. (D. C.) 234 Fed. 943, the only case in which the delay was less than 6 years, Judge Mayer regarded the communications between the parties as constituting an estoppel. The plaintiff never appealed from this decree. 239 Fed. 543, 152 C. C. A. 421. In A. R. Mosler & Co. v. Lurie, 209 Fed. 364, 126 C. C. A. 290 (C. C. A. 2d), the delay was 11 years, and, although an accounting was denied, an injunction passed.

There are no circumstances here which under any rule should deny the right to an injunction. As to an accounting, the same result should follow. The parties were never in negotiation about this patent; at least, there is nothing in the record about it. The plaintiff, by positive conduct, or by a false start and subsequent inaction, never lulled the defendant into illusory security. The infringement was clear, and occurred in an art where the two parties were large producers, and have been in constant litigation. Each must have known what the other was doing. In such circumstances the infringer has no just complaint, so long as the patentee begins his suit within 6 years after the infringement commences. He is subject to those damages of which he necessarily takes the risk and which the plaintiff could have recovered at law without question.

Decree, with accounting, on claim 6 of patent 768,019 against the Excelsior vapor valve, and on claims 1, 6, and 7 of patent 13,059 against the convertible system with the Excelsior vapor valve. Bill dismissed as to all other claims.

Settle decree on notice.