KAPLAN v. ROBERTSON, Commissioner of Patents.

No. 1441.

District Court, D. Maryland.

May 21, 1931.

Howson & Howson, of Philadelphia, Pa. (Charles H. Howson and Dexter N. Shaw, both of Philadelphia, Pa., of counsel), for plaintiff.

T. A. Hostetler and J. F. Mothershead, both of Washington, D. C., for the Commissioner.

WILLIAM C. COLEMAN, District Judge.

This is a suit brought under section 4915, Revised Statutes (35 USCA § 63), whereby plaintiff seeks to establish his right to require the Patent Office to issue to him a patent on an alleged invention having to do with high-speed hydraulic turbines, and, more specifically, as defined in plaintiff's claim, with "a runner wheel for high speed water turbines provided with guide vanes, said wheel comprising a plurality of angularly adjustable blades, and means to adjust said blades while the wheel is running so as to vary not only the outlet angles and passages but also the inlet angles and passages of the wheel, to correspond to variations in the supply of water and in the power required."

High-speed hydraulic turbines, such as are employed in modern water power developments for the generation of electric power, must be operated at constant speed under varying conditions of load, i. e., power consumption, and therefore the admission of water to the turbine runner or wheel must be regulated accordingly. That is to say, at part load, when less than normal power output is required, the quantity of water admitted to the turbine is reduced. Plaintiff asserts that the regulating devices in use prior to his alleged invention had the disadvantage of greatly reducing the efficiency of the turbine when the latter was operating at other than one particular load, and he claims to have overcome this defect and to have accomplished turbine operation with uniform efficiency at all loads. The two features with which Kaplan's device deals are, first, so-called guide vanes, the function of which is to guide the water to the runner or the turbine wheel; and, second, the runner or the turbine wheel itself.

The Commissioner of Patents refused plaintiff's application for a patent, whereupon plaintiff appealed to the Court of Appeals of the District of Columbia, and there the Commissioner was affirmed. 58 App. D. C. 193, 26 F.(2d) 565. The Acts of March 2, 1927 (section 11) and March 2, 1929 (section 2 (b), amending Rev. St. 4915 (35 USCA § 63), and providing that the remedy by

bill in equity would only exist in the event that the applicant had not appealed to the Court of Appeals of the District of Columbia, for which, by the later of the two amendments the Court of Customs and Patent Appeals was substituted, did not become effective until after plaintiff's appeal in the present case from the Commissioner to the Court of Appeals of the District of Columbia had been taken. Therefore this proceeding is governed by section 4915 as it stood prior to its amendment. The Commissioner of Patents has accepted service, and no question of jurisdiction arises in the present case.

The present proceeding is not in the nature of an appeal, but rather a trial de novo, with all the customary power of an equity court to hear the evidence fully and to make its own findings. Butterworth v. U. S., 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656; Model Bottling Machinery Co. v. Anheuser-Busch Brewing Association (C. C. A.) 190 F. 573; Clements v. Kirby (C. C. A.) 274 F. 575; Miehle Printing Press & Mfg. Co. v. Miller Saw Trimmer Co. (C. C. A.) 6 F. (2d) 417.

In addition to the claim specifically rejected by the Patent Office and above quoted, the bill of complaint submits two additional claims germane to the subject-matter, and asks for a decree directing the Commissioner to issue a patent on these claims as well. The Commissioner sets up, by way of defense, (1) prior patents, and especially patent to Ludlow, No. 67,994, issued August 20, 1867; and (2) inadmissibility in the present suit of the additional claims on the ground (a) that they had not been considered by the Patent Office or the Court of Appeals, and (b) that, even if they should be here considered, they are substantially the same as the single claim properly before the court, except that movable guide vanes are described, and that, since the drawings show no guide vanes, the claim of a new specific element not heretofore disclosed is not permitted.

Hydraulic turbines described by a variety of terms, such as runners, water turbines, reaction wheels, rotary wheels, etc., of both high and low speed, are old in the art. They have been in use for upwards of one hundred years for obtaining power by utilizing energy stored in a head of water, and in their earliest forms represented improvements upon wheels used in gristmills. The water is caused to flow through the turbine or runner in passing from a higher to a lower level, and, since the direction of the flow of water is changed as it passes through the runner, the runner revolves. It is mounted on a shaft which revolves as the runner revolves, and the shaft drives the machinery or electrical generator with which it is directly connected.

With the gradual development of the art, it was found desirable to guide the water to the runner with a whirling peripheral motion, and thus the wheels were placed within a circle of guide vanes or gates. At the time Kaplan entered the field, there were in common use, both in this country and abroad, the Fink guide or turn vanes, otherwise known as wicket gate casing. This device consisted of a circular series of movable vanes or gates surrounding the runner, by means of which the water was guided to the runner in a path approximately tangential to the outer periphery of the runner, thereby giving to the water a swirl as it approached the runner blade. By regulating, that is, by opening and closing these gates or blades, they performed the additional function of regulating the amount of water admitted to the runner. The wheel or turbine that had been in use for half a century or more prior to Kaplan's entry into the art was the so-called Francis turbine, which had fixed blades, and with which the Fink guide vanes were used. These vanes appear to have been the only known means at the time of Kaplan's application for varying the angle of admission of water to the runner. Kaplan's alleged invention did not involve any change in the structure of these guide vanes, nor the adoption of any substituted means for regulating the admission of water to the runner. His object was to remedy a defect in turbine operation as then known to the art. In short, he believed that it was the employment of the movable guide vanes, of which the Fink model were typical, as the device for regulating the admission of water to the fixed runner blades, that led to the loss of efficiency, especially in high-speed turbines, and this he sought to overcome, and, as the evidence shows, did overcome, by making the runner blades adjustable, and by adapting their inlet and outlet angles and passages to any desired admission of water— accomplished by turning the guide vanes— thereby preventing axial eddies and obtaining higher efficiency.

It appears that the use of the Fink turn vanes or movable guide vanes had, especially in connection with high-speed runners, the disadvantage that the efficiency of the turbine rapidly decreased when the quantity of water passing through it was reduced; in

other words, the turbines failed to maintain desired efficiency at partial loads. Here it is proper to allude to the fact that modern turbines are required to run at varying loads, since the current output of the electrical generators varies throughout any given day. The generators themselves must be run at constant peripheral speed in order to maintain a constant electrical pressure or voltage. In operating the turbine at constant speed, or at loads less than normal, the amount of water passing through the turbine must be reduced, which Kaplan accomplishes by turning the movable guide vanes to such an angle that the amount of water admitted bears proper relation to the load on the generator. Such adjustment is accomplished automatically by means of a governor. Kaplan found that the decrease in efficiency at partial loads was caused by the change of angle and velocity of the entering water, and that a runner which was capable of maintaining maximum efficiency at normal loads would not maintain the desired efficiency when the angle and velocity of the water were changed to correspond to other loads, since the water would have an incorrect path of travel relative to the blade. Therefore, in his combination, for each position of the movable guides determined by the load, there is a corresponding predetermined angular position for the runner blades. He claims that the shape of the runner blades is important, in that, in order to maintain high efficiency, there must not only be a co-ordinated relationship between the angle of the water admission and the angle of the runner blades, but also both the inlet and outlet angles and passages must be correctly maintained for each co-ordinated position. Summarized, the advantages claimed for Kaplan's device are three: First, sustained efficiency over wide ranges of load, growing out of the avoidance of axial eddies; second, stability of operation at all loads; and, third, less "pitting" of the blades, and therefore greater permanency.

We will address ourselves first to the Commissioner's contention (a) that the two additional claims, because submitted for the first time in the bill of complaint, should not be considered; and (b) that, even if entertained, they are not supported by the drawings, and that therefore the application fails to meet the requirements of section 4888 of the Revised Statutes (35 USCA § 33).

We are not impressed with the merit of either of these arguments. This court, in a proceeding of this kind, may consider claims not included in the application filed in the Patent Office, provided they are germane to the subject-matter. Schiller v. Robertson (D. C.) 28 F.(2d) 301, and cases therein cited. The differences between the original and the new claims consist of the following: Where the original claim refers to "high-speed water turbines provided with guide vanes," the first of the additional claims refers to "movable guide vanes adopted to vary the admission of water to said turbine," and also, instead of referring merely in general language to variations in the supply of water, refers to such variations "passed through said guide vanes." The second additional claim is identical with the first additional one, except that it omits reference to adjustment of the runner blades "while the wheel is running." None of these changes is a vital alteration of the original claim. The specifications refer to Fink vanes which, as already pointed out, are old in the art and are movable. Also means for adjustment of runner blades while the wheel is running is not per se new, nor is plaintiff claiming it as part of his invention, because, as we shall later see, it is shown in the Ludlow patent. Lastly, the description of the invention as contained in the claims; interpreted in the light of the specifications, is to be neither restricted nor extended by the drawings, and, a fortiori, it is not absolutely necessary that the drawings accompanying the application shall disclose a particular device that is employed, if it forms no part of the invention, is well known to the art, and if, as here, it is embraced in the specifications which provide for adjustment of the runner blades automatically by any suitable means. Rev. St. §§ 4888–4891 (35 USCA §§ 33, 34); Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564. The evidence shows that in plaintiff's latest model turbines the movements of the gate control system and of the runner control system are synchronized by operating the gates and the runner by servo-motors, driven by oil.

We now come to a consideration of whether Kaplan's device is anticipated by the prior art, and especially by the patent to Ludlow, upon which reference the Commissioner primarily relies.

Ludlow may be described as a water wheel in which a runner is placed in a flume and is surrounded by a number of fixed vanes or guides. The wheel comprises blades, called, in the art, buckets, slightly curved in serpentine form, mounted on pivots or rods, upon which they may be turned while the wheel is running, thereby controlling the amount of water utilized by the wheel; that

is, the angles at which each bucket is set in relation to the other determines the capacity of the water allowed to issue between the buckets. The only other means provided for varying the supply of water is by opening a valve in the ventilating pipe to lessen the suction force in the draft tube.

We must conclude that Kaplan is not anticipated by Ludlow. The gist of the former resides in the co-ordination of the inlet and outlet angles and passages of the runner blades with the variations in the angle and velocity of the water admitted to the runner by the movable guide vanes. In other words, Kaplan does not in any sense control the flow by the runner blades, but relies upon the movable guide vanes; whereas the sole purpose on the part of Ludlow in adjusting his runner buckets is to control the amount of water passed through the wheel. Furthermore, we are satisfied, from the evidence that, because of their particular shape, the Ludlow buckets are not adapted for use with movable guide vanes. We cannot see, therefore, that Ludlow is like Kaplan in either structure or operation, although, of course, the fundamental object sought to be attained by both is the same; i. e., regulation of the capacity of the wheel to suit the amount of power it is required to give forth, thereby enabling the wheel to work at less power than its maximum, with the use of a proportionate amount of water only.

The other references are much less similar to Kaplan's device, and therefore call for little discussion, because under no reasonable interpretation can they be said to anticipate Kaplan. Newlin patent, No. 87,585, March 9, 1869, has no guide vanes whatsoever, and therefore it does not embrace the basic combination. None of the following four references, i. e.: Angel patent, No. 98,330, December 28, 1869, and reissue No. 6,178, December 22, 1874; Sylvester patent, No. 321,660, July 7, 1885; Felthausen patent, No. 1,032,887, July 16, 1912—discloses a runner having adjustable blades, but merely discloses various forms of construction of movable guide vanes in combination with fixed bladed runners.

The Commissioner further claims that Kaplan's device is fully disclosed in his own patent No. 1,467,672, issued to him September 11, 1923. But with this we cannot agree. A reading of the claims under this patent clearly indicates that it relates and is restricted to specific features, whereas the present application embraces broad claims not so limited. For example, the broadest claim (No. 1) in No. 1,467,672 is limited to a runner adapted to axial admission of the water, and to a particular type of mounting for the runner blades, which is not true with respect to the claim here in issue. But, aside from these considerations, we must look to the date of the respective applications in order to determine Kaplan's full rights. The application here in issue was filed July 30, 1914; the one under patent No. 1,467,672 not until September 1, 1921, seven years later. Due to the intervention of the World War, Kaplan being an Austrian, the case was abandoned in 1916, but revived after the war, and on January 19, 1922, the Commissioner appears to have recognized Kaplan's right to reconsideration, in which the Commissioner was correct under the Act of March 3 1921 (the Nolan Act [35 USCA §§ 80–87]), pursuant to which Kaplan is entitled to the benefit of the date when his application was first made. Therefore the application now in issue is to be treated as still prior in time to that under patent No. 1,467,672. When a patent has issued, no subsequent claim by the patentee can be valid for the same invention; but, if the claims be different, and the applications are pending concurrently, it makes no difference in which of the two applications the broader claims appear, and the generic claims may issue last, unless they were for the first time introduced into the application after the first patent issued, which is not the situation in suit. Vapor Car Heating Co. v. Gold Car Heating & Lighting Co. (D. C.) 296 F. 188; Id. (C. C. A.) 16 F.(2d) 194; Id., 268 U. S. 705, 45 S. Ct. 639, 69 L. Ed. 1167.

It having been determined that Kaplan's device is not anticipated by the prior art, there remains for decision the question whether it is an invention. The test of patentability for a mechanical patent is novelty plus utility. The law regards a change as a novelty, and the acceptance and utility of the change as further evidence or demonstration of novelty. First, then, as to whether Kaplan's device is novel. It has long been settled that all the elements of a mechanical combination may be old and yet it may be patentable. Hubbell v. United States, 179 U. S. 77, 21 S. Ct. 24, 45 L. Ed. 95; Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 301, 29 S. Ct. 495, 53 L. Ed. 805; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co. (C. C. A.) 139 F. 312; Ingersoll v. Delaware & Hudson

Co. (C. C. A.) 37 F.(2d) 465; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp. (C. C. A.) 40 F.(2d) 910.

As was said in the Hubbell Case, supra, which was concerned with an improvement in metallic cartridges (page 86 of 179 U. S., 21 S. Ct. 24, 28): "Nor can we accept the contention that these two combinations are identical because they are intended to obtain the same result. What we have to consider is not whether the end sought to be effected is the same, but whether the devices or mechanical means by which the desired result is secured are the same." Again, in Diamond Rubber Company Case, supra, the Supreme Court, in dealing with a patent for an improvement in rubber tires, said (page 435 of 220 U. S., 31 S. Ct. 444, 447): "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

The guiding principle is again exceedingly well stated in the Imperial Bottle Cap & Machine Company Case, supra, which had to do with a bottle stopper patent. There the Circuit Court of Appeals for this circuit said (page 320 of 139 F.): "The finding in the old devices, one portion here, one in another, and so on, should not defeat a patent for the combination, which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, co-operating to produce the same results. Even if any of them nearly approached the complete invention, if they were not operative or available there would be the presumption that they were not identical with one of admitted superiority, the merits and utility of which are proved by general use. Granting that the elements were known, something before unknown had to become known. A new operative means

had to be devised, by which what was known could be made available, and a creative or inventive faculty had to be invoked and exercised to discover the availability of a mode of application by which forces already known could be so united as to effect results desired, and theretofore sought in vain. The unknown and untried factors had to be united with the known factors, and the combination of these elements into a practical, operative means, and its embodiment into a concrete thing, constitute invention."

Similarly, there can be no doubt about the utility of Kaplan's device. The evidence discloses that it was first introduced in Europe about 1923, patents were obtained in numerous countries, and it was so successful that in some five years it had completely superseded the Francis turbine with fixed blades in the field to which it was applicable. In 1928, Kaplan's device was first introduced into the United States. In approximately two years, the American licensee had sold twenty-two of these adjustable blade turbines, with a total horse power of 166,799, for which was paid over $1,000,000, and the total power plant equipment in which the units were installed involved an expenditure of more than $35,000,000. The evidence is further uncontradicted to the effect that, while the Kaplan device costs more, per unit, than does the fixed blade turbine, the increase is offset more than tenfold in the course of a year by economies that are effected. Six of these units are now being installed at Safe Harbor, Pa., at a cost of more than $1,000,000, the entire water power project of which they form a part representing a total expenditure of about $3,000,000. Therefore, were there any doubt as to the patentability of the device here in issue, its demonstrated commercial utility and success would require that such doubt be resolved in favor of Kaplan. Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., supra.

In conformity with this opinion, a decree will be entered in favor of the plaintiff for all of the claims embraced in the bill of complaint, directing the Commissioner of Patents to grant a patent thereon.