## FREEMAN v. PREMIER MACH. CO., Inc.

### No. 3909.

District Court, D. Massachusetts.
Aug. 6, 1935.

Chas. E. Riordon, of Washington, D. C., and Nathan Heard and Frederick A. Tennant, both of Boston, Mass., for plaintiff.

Macleod, Calver, Copeland & Dike, George P. Dike, and Cedric W. Porter, all of Boston, Mass., for defendant.

BREWSTER, District Judge.

In this suit the plaintiff alleges infringement of United States letters patent 1,681,-033. Infringement is admitted if the patent is valid. The defenses are anticipation and want of invention. The latter defense is the one principally relied upon.

### Statement of Facts.

1. On August 14, 1928, upon an application filed December 3, 1923, letters patent of the United States No. 1,681,033 issued to the plaintiff covering an alleged improvement in machines for use in the manufacture of boots and shoes, particularly for forming the open-work or cut-out section in shoe uppers.

The patent carries 94 claims, some relating to the machine as a whole; other claims are confined to dies used in the machine. Since the defendant is only a manufacturer of dies, the only claims involved in this suit are those relating to the dies which the plaintiff claims to have invented for use in his machines. The claims involved are said to be 6 to 8, 10 to 18, 62, 65 to 74, 79, 81, and 94. Of these claims, 6, 16, 74, and 81 have been deemed by the parties as typical of the 26 claims in suit. These claims are as follows:

"6. For use in a machine for cutting designs in shoe uppers, the combination including work supporting means, a work cutting unit with upstanding cutting edges mounted thereon, said work supporting means and work cutting unit constructed with a top portion to support in a substantially flat manner a portion of the shoe upper in which a design is to be cut and with lateral sides so shaped that the upper may be draped thereabouts, without buckling the shoe upper while the design is cut therein."

"16. A support for shoe upper material to be ornamented, comprising stripping means mounted thereon, and a clamping mask cooperating with said stripping

means to hold a portion of shoe upper material under tension, said mask being provided with an edge portion to partially surround that portion of the upper material to be ornamented, said edge portion being shaped to act as a gauge for the positioning of the material beneath the mask."

"74. A die for a machine for cutting open-work designs in shoe uppers which have been stitched to form a closed piece of work, comprising one or more cutting members having cutting edges forming the design to be cut in the upper, devices to act as a guide in positioning the work to be cut with relation to the cutting members, supporting means upon which the cutting members are mounted, said means arranged to support said members in an elevated position above the bottom portion of the supporting means sufficiently to allow that portion of the upper to be cut to be placed in a substantially flat position upon the upper surface of the cutting members and supporting means while remaining portions of the upper extend about the side or sides of the die without buckling that portion of the upper supported flatwise and having as its base portion guiding means located substantially centrally of the cutting die and adapted to co-operate with similarly disposed guiding means on the base of the machine, to guide the movement of the die as it is transferred from a work placing position to a work cutting position."

"81. In combination, a cutting die provided with cutting edges, and a holddown plate for the cutting die comprising a flat plate adapted to be pressed against the work, said plate being provided with an opening to surround the cutting edges of the die, one edge of said opening being arranged to act as a gauge for the positioning of a piece of work beneath the holddown."

2. Prior to plaintiff's invention, which was first disclosed about 1921, machines had been in use by shoe manufacturers for punching designs in the tips of shoes and in making eyelets and buttonholes. When, about 1923, the style and fashion of cut-out ornamental designs in the shoe uppers came into vogue quite extensively, it was deemed unprofitable to produce shoes with these ornamental cut-outs except by manufacturers of handmade or high-priced specialty shoes.

Before Freeman entered the art with his invention, the usual method of making cut-out shoes was to take the pieces of material which were to be made into the upper and cut out the desired pattern with the use of a templet and a knife or with a hand mallet die placed over the piece with reference to inked marks thereon, or with what is known as a flat bed die, on which the piece to be cut was laid with respect to edge gauges. The flat bed die was used in presses similar to those utilized by the plaintiff, and the principle of employing upstanding cutting edges mounted upon a work support was applied in the use of flat bed dies.

According to these earlier methods, the cut-out pieces were later assembled into the shoe upper with the result that the lining was present beneath the cut-out holes. The completed upper, known as the "fitted upper," was then built over the last and the shoe finished; and operatives in the packing room of the shoe factory cut out the lining either with a knife or a machine known as the "Booth trimmer."

Experience taught that this additional operation was not only expensive but oftentimes unsatisfactory. Evidence was offered by the defendant tending to show that by the use of the handle die it was possible to cut through not only the leather but the lining as well, thus cutting out the ornamental designs after the shoe had reached the stage of a fitted upper. The weight of evidence, however, was that such process was not feasible or economical and had not been adopted by shoe manufacturers. There was also evidence, and I find, that machines old in the art had been used with flat bed dies in making cut-out shoes. This was done by laying the vamp over upon the flat bed die and holding it in position by the hand. Such operation was fairly satisfactory if the cut-out was in the shoe upper, but it was impossible to carry the operation to the quarters or sides of the shoe.

The art of perforating shoe tips by the use of tip presses was fully covered by patent as, for instance, Rigby, No. 1,113,910 (1914); Schwalbach, No. 1,313,956 (1919); Hudson, No. 1,389,645 (1921).

The Booth trimmer, for cutting out lining, was also protected by Wentworth, No. 1,279,624.

3. In this state of the art, Freeman entered. What he did was to provide a mechanical device which could be used to cut decorative patterns anywhere in the shoe upper with accuracy and speed by a sim-

ple machine operation and substantially unlimited as to shape, number, and location of cut-out holes; the operation being carried out on the closed upper completely lined, cutting the upper and lining in one operation. This operation obviated the necessity of trimming and marking the work for location of cut-out design.

He accomplished this purpose by devising a die which has come to be known as the "anvil die" to distinguish it from the flat bed die. In this device he has embodied the following elements: (1) A movable work support or anvil. This element is constructed with a flat top and recessed lateral sides over which a fitted upper may be draped. (2) A work cutter mounted on the work support having upstanding cutting edges. (3) A stripper mounted on the work support. (4) A mask which serves as a clamping means for the work, and as a gauge or locating means for the work. According to the claims, the so-called mask or holddown plate is provided with an opening to surround the cutting edges of the die, one edge of said opening being arranged to act as a gauge for the positioning of a piece of work beneath the holddown.

According to his specifications, Freeman points out that the machine will operate with equal facility upon the sides of the upper, particularly the closed upper, upon the quarter sections, through the vamp, boxing, tongue portion, or tip, and that by the operating instrumentalities the open-work designs and formations may be cut out entirely through the upper and lining in one machine operation.

4. The plaintiff concedes that all the elements, taken separately and divorced from function or combination, were old.

In view of this admission, it is unnecessary to dwell further upon the mass of evidence introduced by the defendant, tending to show that some one or more of these elements were to be found in patents issued prior to Freeman's invention.

5. It cannot be contended on the evidence that any device, previously used in shoe manufacturing or disclosed in the prior patents, embodied all of these elements, although it is possible to find one or more of the elements in the prior patented art cited by the defendant.

Patents cited by defendant, such as Stanbon, No. 1,430,697 for vamp gauge for punching machines, Whitcomb, No. 1,430,-710, for vamp locating device, and Newton, No. 1,439,019, for vamp perforting machine, embody several elements of the Freeman device in combination; but no one of them shows a die constructed with recessed sides to receive the uncut portion of the upper, or the specific features of the Freeman mask.

Since none of these patents shows a device designed to accomplish the purposes of the Freeman dies, and none of them discloses all the elements in the same association, it seems unnecessary to prolong this opinion with a detailed discussion of these several citations.

It is sufficient to find, as I do, that none of them was designed to meet the problem which confronted Freeman, none showed the same means of accomplishing the intended results, and none could be adapted to produce those results without material modifications.

6. When a necessity for some device for cutting out these ornamental designs in ladies' shoes and slippers became evident to shoe manufacturers, two other applications for patents on similar devices were filed, and an interference was declared between Freeman and the other applicants, which interference was finally adjusted with the result that a patent was issued to Freeman, and the other applicants became licensees under him.

7. Machines and dies, made according to the teachings of the patent, were put upon the market and became widely and popularly known as the "Freeman Cut-Out Machine." They were received by the shoe manufacturers as a distinct improvement in the means of cutting out ornamental designs in ladies' shoes. Plaintiff's witnesses testified that, before the machine was perfected, it was unprofitable to manufacture low or medium priced shoes with the ornamentation demanded by the prevailing styles. The machine met a pressing need, and no doubt made a marked impression on the industry. The evidence warrants the finding that the Freeman Cut-Out Machine was commercially successful and that its success was due to its merits, and not to extensive advertising. From November 1, 1923, to November 1, 1924, 132 machines were sold, and licenses were granted to a number of die manufacturers to manufacture under the patent.

8. The defendant is engaged in the business of manufacturing and selling dies which infringe the claims of the plaintiff's patent, involved in this suit.

## Conclusions of Law.

[1-4] The defendant has not made out its defense of anticipation. It has produced nothing from either the patented or applied art which shows all the elements in the same association, or designed to accomplish the same end results. Clearly, dies operated by hand do not anticipate, nor do the flat bed dies previously used in the Knight press. They do not embody the essential elements of Freeman's invention. The modifications necessary to accomplish the purposes of the Freeman machine negative any claim of anticipation. Freeman v. Altvater (C. C. A.) 66 F.(2d) 506; Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation (C. C. A.) 40 F.(2d) 910; Allis-Chalmers Mfg. Co. v. Columbus Electric & Power Co. (C. C. A.) 19 F.(2d) 860; Babcock & Wilcox Co. v. Springfield Boiler Co. (C. C. A.) 16 F.(2d) 964; Wolff v. Jordan Marsh Co. (D. C.) 9 F. Supp. 516.

There is no identity of means to secure the results, assuming the ends sought were identical. Ingersoll v. Delaware & Hudson Co. (C. C. A.) 37 F.(2d) 465; Hubbell v. United States, 179 U. S. 77, 21 S. Ct. 24, 45 L. Ed. 95; Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

The defense of noninvention is not so easily disposed of. The patent under consideration is a machine patent and not a process patent. It is well to keep in mind that the claims involved relate only to a mechanical device known as the "anvil die and mask," which is used in association with a pressing machine. The claims describe mechanical means employed to accomplish a definite object which the inventor had in contemplation. It is conceded that all the elements of the patented anvil die and mask are to be found in the prior art. No new element was introduced by Freeman. What he claims as his invention is a novel combination, producing a result which improved upon the old. In a mechanical patent, the fact that the elements brought together are all to be found in the prior art does not necessarily defeat the patent.

Walker, in his work on Patents (5th Ed., § 37), states a rule which is pertinent to the present inquiry. He says:

"A new combination, with a new mode of operation, may be invention; even if all the parts thereof are old, and even if the function of the combination, is also old. * * * In each of many arts, many patents have been granted, on a corresponding number of new combinations of old parts, for performing precisely the same function. The earlier of those combinations may be useful; but not useful enough, because not rapid enough. To deny the quality of invention, to all the later, different, and far superior combinations for doing the same thing, would be unreasonable, and unjust, and plainly contrary to Section 4886 of the Revised Statutes."

Compare Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 328, 67 L. Ed. 523.

This rule has been recognized in recent cases dealing with mechanical patents. Kaplan v. Robertson (D. C.) 50 F. (2d) 617; Kawneer Co. v. McHugh et al. (D. C.) 51 F.(2d) 560; Alemite Mfg. Corporation v. Rogers Products Co., Inc. (C. C. A.) 42 F.(2d) 648; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation, supra; Skinner Bros. Belting Co. v. Oil Well Improvements Co. (C. C. A.) 54 F.(2d) 896. See, also, Trico Products Corporation v. Apco-Mossberg Corporation (C. C. A.) 45 F.(2d) 594.

The test of patentability of combination was stated in this circuit in the case of Trico Products Corporation v. Apco-Mossberg Corporation, supra, 45 F.(2d) 594, page 599, as follows:

"A combination, to be patentable, however, must form either a new machine or device of a distinct character and function, and produce a result due to joint and cooperating action of all the elements, and not the mere adding together of separate elements, each producing an independent result."

It is my opinion that, measured by this criterion, Freeman brought forth something more than a mere aggregation. There was co-operative action of the several elements, producing results that could not be produced by any device then known to the art.

I take it that it is still necessary for the plaintiff to show that this new combination was the product of inventive genius and not merely of ordinary mechanical skill.

Defendant is ready to concede that Freeman may have displayed inventive genius in discovering an improved process, but argues that, having discovered the proc-

ess, he exercised no inventive faculty when he pointed out a way of putting the process into effect by mechanical means. It is said that the necessary adaptation of old devices was obvious to any one with ordinary mechanical skill. It is my opinion, however, that a new device which rendered more practicable and more economical a process of cutting out shoes is more likely to amount to invention if the inventor also discovers the process. In any event, he cannot be prejudiced by the fact that he also has a patent on the process.

Compare Steinmetz v. Allen, 192 U. S. 543, 24 S. Ct. 416, 48 L. Ed. 555.

It is urged that Freeman only put old machines to new uses, and that that was not invention. There might be some pertinency to that point if the claims in suit related to the press or punching machines. Such machines may have been put to new uses, but those taken from the prior art needed essential alterations in order to perform the functions of the Freeman Cut-Out Machine. The limitations put upon the present inquiry leave out of consideration the matter of adapting punching or stamping presses to the work of a cut-out machine operating on finished uppers.

The real difficulty arises from the contention that it was not invention to conceive the anvil die and mask which served as both clamping means and a guide for the work. If we were concerned with the mask dissociated from the die, of course there would be no invention in merely changing the shape, or dimensions, of those already known performing the same functions in the same way. But the claims are combination claims. The mask is only one element of the combination. The issue is whether the combination rises to the dignity of invention.

It is argued, with respect to the anvil die with its raised work support, and the recessed sides which allow the finished upper to be cut out both through lining and leather, in one machine operation, that it is only a modification of the flat bed die which any mechanic would have hit upon if he faced the necessity of cutting out designs in finished uppers which could not readily be cut out on a flat bed die. I confess that the argument is not without merit. There is language in recent cases in the Supreme Court that lend support to defendant's views. Thus, in Altoona Publix Theatres v. American Tri-Ergon Corpora-

tion, 294 U. S. 477, 55 S. Ct. 455, 459, 79 L. Ed. 1005, Mr. Justice Stone says:

"The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill, not of invention."

On the other hand, we have Eibel Process Co. v. Minnesota & Ontario Paper Co., supra, which is regarded as one of the landmarks in patent law, where the court said Eibel was an avowed improver, not in the art of paper making generally, but upon a well-known and universally used machine; the court stating:

"His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment. Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers, and certainly finds no reason to withhold from the really meritorious improver, the application of the rule 'ut res magis valeat quam pereat.'"

The defendant has made some point of the fact that there was interference declared between Freeman and other applicants for patents. From the number of cited patents which had previously been issued to these applicants for inventions relative to shoe machines, the inference is warranted that these applicants were more than mechanics. They were inventors, and the fact that they had worked upon the problem does not seem to me to militate against the claim of the plaintiff that what he did amounted to invention.

I think it must be admitted that the case comes near to the border line which separates the patentable from the unpatentable. However, Freeman conceived a mechanical device which was novel, and its utility has been amply demonstrated. If we throw into the scales the presumption which arises from the granting of the patent [Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U. S. 1, 55 S. Ct. 928, 79 L. Ed. 163] and the proven commercial success of the device obviously

flowing from its merits [Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Frick Co. v. Lindsay (C. C. A.) 27 F.(2d) 59; Wolff v. Jordan Marsh Co., supra], the scales will tip in favor of the plaintiff.

I therefore have reached the conclusion that the plaintiff is entitled to a decree declaring the claims in suit valid and infringed.