Norman **RENDLEMAN** and United Engineering and Foundry Company, Plaintiffs,

v.

David L. **LADD**, Commissioner of Patents, Defendant.

Civ. A. No. 2417-59.

United States District Court
District of Columbia.

June 27, 1961.

Ivan P. Tashof, Milton Osheroff, Washington, D. C., William H. Parmelee, Elmer S. Utzler, Henry C. Westin, Pittsburgh, Pa., for plaintiffs.

C. W. Moore, Sol., George C. Roeming, Washington, D. C., for defendant.

SIRICA, District Judge.

This is a civil action brought under 35 U.S.C. § 145 in which plaintiffs Norman Rendleman, as the applicant, and United Engineering and Foundry Company as the assignee of an application for patent entitled "Metal Rolling," serial number 327,484, filed December 23, 1952, seek to have the Court authorize the issuance, to the assignee, of a patent containing claims 10, 11 and 14–18 (entered and examined in said application), and proposed claims 19–22 (which were not entered by the Examiner), not examined and not considered by the Board of Appeals of the Patent Office in its decision.

The claimed invention is for what is known in the art as a "continuous rod mill." A continuous rod mill is used for converting white hot steel "billets" (usually 30 feet long and from two to two and one-half inches square) into "rods" several hundred feet long. These rods are sold to industry in coiled form. Industry may then subsequently convert the coils into still longer coils of wire, or into various products or machines that unwind the coils, straighten the rod, and cut it into short pieces, converting the pieces into products such as bolts, nuts, concrete reinforcements, and numerous other items. Such a mill is one of the more intricate devices found in the steel industry. A single mill of the type here involved occupies a large floor area and is said to cost between sixteen and eighteen millions of dollars.

As a preliminary to converting a billet into a rod, the billet must be heated until it is white hot throughout its entire length and section. This heating is accomplished in a "billet heating furnace" in which the billets lie side by side, and as one is pushed in at the entering end, a heated billet is pushed out from the other end. The hot metal is increased in length and reduced in crosswise dimension by a simple process of "squeezing." The hot metal is squeezed by passing it between a pair of motor-driven rolls having matching grooves in their peripheries. Tht matching grooves are called a "roll pass," and the combination of two rolls is called a "roll stand." The billet heating capacity of the furnace should be matched to the capacity of the rod mill itself. Each billet must be rolled from its original size to the finished size before it gets too cold. This requires that the entire operation be done at high speed. This high speed factor requires that the "roll stands" be placed relatively close together. The matter of the relative speeds of each stand of rolls therefore becomes a critical factor.

All present and prior rod mills and the present application contain three essential sections, a "roughing train" where the initially large (in cross-wise dimension) billet is first reduced in area, an "intermediate train" where the rod is further reduced and a "finishing train" where the rod is finally reduced to the desired size of the end product. Each of these "trains" in the various prior patents consists of a varying number of the aforementioned "roll stands." The present application uses no apparatus not known and used in other rod mills. The claimed novelty of this mill is in the overall organization. Plaintiff claims: "In the instant case the elements of the mill are not new but the mill has been reorganized to accomplish certain things that the prior art did not accomplish, and of which it had no concept." (Plaintiffs' pre-trial brief, p. 52.)

The rod mill disclosed in the application as the preferred embodiment comprises twenty-two roll stands with five controlled loops. There are eight roll stands in the roughing train with the first two separately motor driven from the others; eight roll stands in the intermediate train separated into groups of two, each group being separately driven and each in looped relation to the adjacent train or group; six roll stands in the finishing train, alternation of roll pass shape being maintained throughout the stands. The disclosed method of operating this mill to get best results at all sizes of rod from ¼ inch to ²¹⁄₃₂ inch includes operating the exit pass of the roughing train at constant product cross-section and constant speed and keeping four motors operating in the intermediate train and maintaining four loops [1] preceding the exit stand of the intermediate train by omitting intermediate stands in multiples of two, only one stand from each group of two. In so operating, it may be necessary to shift roll stands to keep the roll pass shape alternation.[2]

In the present application also, where different size billets are used, the adjustments for speed and area which are always necessary in changing product size are made only in the first two stands of the roughing train. The other six roughing train stands operate at constant speed and size for all rods from ¼ inch to ²¹⁄₃₂ inch final product size.

Plaintiff claims it is the new arrangement of the intermediate train of five loops and four groups of stands arranged in pairs which is the important improvement and which has secured "heretofore unrecognized advantages." (Plaintiff's pre-trial brief, p. 20.) It is because of the flexibility of the intermediate roll train that the roughing train can at all times accept the hot metal at the same speed and pass it on to the intermediate train at the same size.

The prior reference patents of record relied upon by the Examiner and the Board of Appeals in rejecting the present application are four in number: Rendleman patent number 1,932,750 (1933), Fisk patent number 1,910,889 (1933), Talbot patent number 1,987,876 (1935) and Peterson patent number 2,-354,771 (1944). The prior Rendleman patent discloses a mill capable of rolling ⅜ inch to ¾ inch rounds. That mill includes a roughing train of five roll stands, an intermediate train of four roll stands, and a finishing train of four roll stands. The number of intermediate roll stands depends on the amount of reduction required for shaping the final product. The intermediate train may have two groups of two stands, each group having an independent motor and being in looped relation to the adjacent train or group. All the stands of the intermediate train are selectively operable. The Rendleman patent discloses operating the roughing train without adjustment of the roll stands. It also discloses rolling various sizes of rod stock by removing stands in multiples of two, but only one from each group of two. In the examples disclosing rolling of ⅜ inch, ½ inch and ¾ inch rounds, the roughing train speed is increased in relation to an increase of product size so that all sizes are produced at the same exit speed of 1,800 feet per minute.

The Fisk patent discloses an eight stand roughing train, a four stand intermediate train and a four stand finishing train. The patent states that in the roughing train, the grouping and number of roll stands may be varied to suit different requirements. The mill is intended to roll sections from ¼ inch round up to 2½ inches round.

---

1. A loop is a space between roll stands where the metal can "sag" or "loop around" to prevent stretching the metal between stands and eliminate "overfilling," either of which damages the product.

2. The roll pass or groove in the motor driven roll varies in shape in rod mills, since it is not good metallurgical practice to reduce metal by having two successive roll passes the same shape. A typical sequence of roll pass shapes or grooves would be diamond, square, diamond, etc.

The Peterson patent discloses a rod mill including a nine stand roughing train, an eight stand intermediate train, and a six stand finishing train. The first two roughing rolls are driven by a separate motor. The intermediate train includes groups of two stands driven by one motor, which groups may be of any number required to furnish the desired reduction.

The Talbot patent discloses a mill for rolling rods and bars. This mill includes a four stand roughing train, a four stand intermediate train and a four stand finishing train. The first two stands of the roughing train are driven by a separate motor.

Title 35 U.S.C. § 103, states as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains * * * "[3]

 Plaintiffs admit that their apparatus as disclosed and claimed consists of a combination of old elements. Therefore, to establish patentability of their apparatus claims 14–18, plaintiffs must show that the combination of old elements as claimed produces a function which is in addition to the sum of the functions of the elements acting outside the combination. (Consolidated Trimming Corp. v. Loudon, 1956, 99 U.S. App.D.C. 213, 216, 239 F.2d 33, 36.) In Consolidated Trimming, the Court stated the test in a new combination of old elements case, to be as follows:

" 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable * * * *A mere advance in efficiency and utility is not enough to convert a non-inventive aggregation into a patentable combination.*' " 99 U.S.App.D.C. at page 216, 239 F.2d at page 36. (Emphasis supplied.)

The basic purpose of the various arrangements and combinations disclosed in the present application and the prior patents is to increase the efficiency of the mill; i. e., to reduce the "down time" of the mill, resulting from the necessity of shifting machinery when producing a different size end product. Plaintiffs' only witness, Andrew Wilson, (an engineer-employee of the patent assignee, United Foundry Company), testified that the present application increases rod mill efficiency from 65% to 85% and produced a better quality product over a greater range of sizes; that two such mills have been built in this country and one in France; that the mill has had a great impact on the industry. ("We have requests * * * from people all over the world * * * to see the Rendleman rod mill." Transcript, p. 120.) It is plaintiffs' contention that these factors indicate that the present arrangement is patentable. The Patent Office Board of Appeals rejected this argument. In Union Metal Mfg. Co. v. Ooms, 1946, 81 U.S.App.D.C. 76, 154 F.2d 857, the Court said in this connection:

"The appellants proved the utility of their product as a cargo boom, and its widespread acceptance by the

---

3. At trial the Court asked plaintiffs' witness Wilson, the following question:
 "Do you think you might have thought of it?"
 The witness replied:
 "It is quite possible at this stage with the training I have had."

The court later inquired:
"Having access to the, we will say to the prior patents, do you think that with your training you might have thought of this?"
 The witness replied:
 "It is quite possible."

shipping industry as a useful device. But a plain absence of invention is not overcome by evidence of usefulness and commercial success. Only where there is doubt as to invention or novelty is proof of practical utility and general commercial acceptance permitted to turn the decision in favor of patentability * * * commercial success does not supply the lacking invention." 81 U.S.App. D.C. at page 77, 154 F.2d at page 858.[4]

Plaintiffs further urge in support of their claim of the patentability of the Rendleman arrangement, the fact that no mills have ever been built according to the specifications of some of the reference patents. Of course, the issue here is not patentability over mills in use but over the patents cited. In Siegel v. Watson, 1959, 105 U.S.App.D.C. 344, 267 F.2d 621, the Court commented on the attempt of the plaintiff to discredit the reference patent by showing that it had not made any impression on the art. "But a patent may have lain for years unnoticed and yet 'it will be as effective to invalidate a new patent, as though it had entered into the very life blood of the industry.'" 105 U.S.App.D.C. at page 347, 267 F.2d at page 624.

■ The Patent Office Board of Appeals rejected plaintiffs' application on the basis of the prior art. Claims 14–18 were rejected (1) as drawn to an old combination of roughing train, intermediate train and finishing train as shown in the prior patents of Peterson, Talbot and Fisk; (2) as unpatentable over the prior Rendleman patent especially in view of Fisk's teaching that the roughing mill train may comprise eight stands divided into groups driven by individual motors; (3) on the prior patents of Peterson or Talbot in view of the

prior patents of Fisk and Rendleman, and (4) as unpatentable over Talbot. Claims 10 and 11 were rejected as unpatentable over the prior Rendleman patent.

■ In a section 145 proceeding, the burden of proof resting on the applicant is extremely heavy. The patent office, as the expert tribunal, is entitled to a presumption of correctness. Cothran v. Coe, D.C.D.C.1941, 38 F.Supp. 984. In making its decision, the Court must initially presume that the decision of the Patent Office was correct and that its rulings are entitled to considerable weight. They will not be set aside unless they are clearly demonstrated to be wrong. Cook v. Watson, D.C.D.C.1960, 181 F.Supp. 896, 898. In Abbott v. Coe, 1940, 71 App.D.C. 195, 109 F.2d 449, the Court stated: "The question for us is not whether in our opinion there was invention, but whether the finding that there was none is consistent with the evidence." 71 App.D.C. at page 197, 109 F.2d at page 451.

The Court has carefully considered all the evidence, the briefs and arguments of counsel, and is not left with the definite and firm conviction, based on its subjective opinion or judgment, that a mistake has been committed by the Patent Office. L-O-F Glass Fibers Company v. Watson, 1955, 97 U.S.App.D.C. 69, 74–75, 228 F.2d 40, 45–46. Plaintiff company is not entitled to a patent containing any of claims 10, 11 and 14 through 18.

### Jurisdiction over Claims 19–22

■ A final rejection of claims 10, 11 and 14 through 18 was entered by the Examiner in the Rendleman application on November 14, 1956. On May 13, 1957, applicant filed both an appeal to the Board of Appeals and an amendment to its application proposing the addition of claims 19–22. Under Rule 116(a) (c)

---

4. In any case, it is not completely clear that any commercial success of the mill is due entirely to the claimed arrangement. The three mills built substantially according to the instant application disclosure incorporate various undisclosed features which aid in improving product quality.

These features include roller bearings, hydraulic cylinders and roller twist delivery guides. Transcript, pp. 53–55. Thus any commercial success is attributable in part to substance other than that claimed.

of the Patent Office, 35 U.S.C.Appendix, after a final rejection of an application by the Examiner, there is no amendment as of right. Rule 116(b) provides that proposed new claims must be accompanied by a showing of good and sufficient reasons why they are necessary and were not earlier presented. Amended claims may be allowed in order to put the case in better form for appeal, but this is discretionary with the Examiner. In this case, the proposed amendment was denied entry by the Examiner. Plaintiffs urge that the proposed amendment "was requested to be entered in the belief that the language therein used might better crystallize the points of novelty." Plaintiffs' pre-trial brief, p. 29. The claims were presented in the brief to the Board of Appeals and error was urged for the failure of the Examiner to allow the entry of these claims. The opinion of the Board of Appeals stated: "Claims 19–22 submitted with the appeal were not entered by the examiner, and are not before us." Rules 127 and 181 of the Patent Office provide for an appeal to the Commissioner of Patents from a refusal of the examiner to admit an amendment. No such petition was made by plaintiffs in this case.

■ It is the rule in the District of Columbia that in the de novo proceedings under section 145, claims not considered by the Patent Office on the merits are not properly reviewable by the Court. Gilbert v. Marzall, 1950, 87 U.S.App.D.C. 1, 182 F.2d 389; Minnesota Mining & Mfg. Co. v. Coe, 1944, 79 U.S.App.D.C. 59, 143 F.2d 12; Lucke v. Coe, 1934, 63 App.D.C. 61, 69 F.2d 379; Chessin v. Robertson, 1933, 61 App.D.C. 376, 63 F.2d 267, certiorari denied 289 U.S. 725, 53 S.Ct. 523, 77 L.Ed. 1475; Shoemaker v. Robertson, 1931, 60 App.D.C. 345, 54 F.2d 456; Kinnear v. Marzall, D.C.D.C. 1951, 95 F.Supp. 55. The statutory requirement that the applicant is entitled to a District Court hearing on claims "refused" by the Board of Appeals means that the District Court is entitled to a decision of the Board of Appeals on the merits of those particular claims. Gil-

bert v. Marzall, supra. In the Gilbert case, Judge Washington commented on the failure of the appellant to utilize the Patent Office procedure under rules 127 and 181 providing for an appeal to the Commissioner:

"It can hardly be suggested that applicants lacked an adequate administrative remedy in the Patent Office, if there was an improper refusal to admit an amendment, or that they lacked judicial remedies as a last resort. * * * Instead of pursuing the established procedures, they continued to negotiate with the examiner for the entry of other claims in substitution for claims 58 to 63, and continued to press the Board of Appeals for reversal of the examiner's original action. They cannot now seek procedural relief in this suit under R.S. § 4915, nor ask the courts to consider claims which have not been considered by the Board of Appeals." 87 U.S.App.D.C. at page 4, 182 F.2d at page 392.

Plaintiffs cite cases from two United States District Courts which hold, in substance, that the Court in a section 145 proceeding may consider new claims not passed on or presented to the Patent Office if they are "germane" to the subject matter. Borg-Warner Corp. v. Goodwin, D.C.E.D.Mich.1945, 61 F.Supp. 139; Kaplan v. Robertson, D.C.D.Md.1931, 50 F.2d 617; Schiller v. Robertson, D.C.D. Md.1928, 28 F.2d 301. In Lucke v. Coe, supra, our Court of Appeals commented on the holding in Schiller as follows: "The decision on this point in the Schiller case was based upon agreement of counsel, and contained no discussion of the question." 63 App.D.C. at page 63, 69 F.2d at page 381. The Court then held that additional claims, not presented to the Patent Office, could not in this circuit be reviewed in the de novo equity proceeding in the District Court (citing Durham v. Seymour, 1895, 6 App.D.C. 78). "We reaffirm our ruling * * * to the effect that while section 4915 [the forerunner of the present 35 U.S.C. § 145] authorizes the introduction of new

evidence, it does not authorize the filing of additional claims." 63 App.D.C. at page 64, 69 F.2d at page 382. Butterworth v. United States, 1884, 112 U.S. 50, 5 S.Ct. 25, 28 L.Ed. 656, urged by plaintiffs here as allowing the consideration of these proposed claims is cited by Durham v. Seymour, and all subsequent District of Columbia cases, for the proposition that new evidence may be introduced in the section 145 proceeding.

Though the claims presented to the Court in Lucke v. Coe were entirely new, in the sense that they had never been presented to the Patent Office, the same reasoning militates against this Court's consideration of proposed claims 19–22. The situation is not unlike that in Cherry-Burrell Corp. v. Coe, 1944, 79 U.S. App.D.C. 124, 143 F.2d 372 where the rule of Lucke v. Coe was declared applicable to a situation where additional claims had been refused consideration by the Board of Appeals. The District Court, in ruling on patent applications in proceedings under 35 U.S.C. § 145, is entitled to have the benefit of the expertise of that agency which, in the first instance, is entrusted by the Congress with the application and enforcement of the patent laws. Proposed claims 19–22 are not before this Court on the merits. Plaintiff company is not entitled to a patent containing any of proposed claims 19–22. The complaint is dismissed.

The Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. This is a civil action brought under 35 U.S.C. § 145 in which plaintiffs Norman Rendleman, as the applicant, and United Engineering and Foundry Company, as the assignee of an application for patent entitled "Metal Rolling," Serial No. 327,484, filed December 23, 1952, sought to have the Court authorize the issuance to the assignee of a patent containing claims 10, 11, 14 through 18, of said application, and proposed claims 19 through 22, which were filed in said application, but not entered therein, not examined, and not considered by the Board of Appeals in its decision.

2. The rod mill disclosed in the application as the preferred embodiment comprises twenty-two stands with five controlled loops, there being eight roughing roll stands with the first two separately driven from the others; eight intermediate roll stands separated into groups of two, each group being separately driven and each in looped relation to the adjacent train or group; and six stands in the finishing train, alternation of roll pass shape being maintained throughout the stands.

3. The disclosed method of operating this mill to get best results at all sizes of rod from $\frac{1}{4}$ inch through $2\frac{1}{32}$ inch includes operating the exit pass of the roughing train at constant product cross-section and constant speed and keeping four motors operating in the intermediate train and maintaining four loops preceding the exit stand of the intermediate train by omitting intermediate stands in multiples of two, only one stand from a group. In so operating, it may be necessary to shift stands to keep the roll pass shape alternation.

4. Where different sizes of billets are used, the adjustment for speed and area is made only in the first two stands of the roughing train. The other six roughing stands operate at constant speed and size for all rods from $\frac{1}{4}$ inch to $2\frac{1}{32}$ inch.

5. The disclosed apparatus consists of an arrangement of old elements.

6. The Rendleman patent No. 1,932,750 discloses a mill capable of rolling $\frac{3}{8}$ inch to $\frac{3}{4}$ inch rounds. That mill includes a roughing train of five roll stands, an intermediate train of four roll stands, and a finishing train of four roll stands. The number of intermediate roll stands depends on the amount of reduction required for shaping the final product. The intermediate train may have two groups of two stands, each group having an independent motor and being in looped relation to the adjacent train or group. All the stands of the intermediate train are selectively operable. The Rendleman patent discloses operating the roughing train without adjustment of the roll stands. It also discloses rolling various

sizes of stock by removing stands in multiples of two, but only one from a group. In the examples disclosing rolling of ⅜″, ½″, and ¾″ rounds, the roughing train speed is increased with increase of product size to produce all products at the same exit speed of 1,800 feet per minute.

7. The Fisk patent No. 1,910,889 discloses an eight-stand roughing train, a four-stand intermediate train, and at least a four-stand finishing train. The patent states that in the roughing train, the grouping and number of roll stands may be varied to suit various requirements. The mill is intended to roll sections from ¼″ round up to 2½″ round.

8. The Peterson patent No. 2,354,771 discloses a rod mill including a nine-stand roughing train, an eight-stand intermediate train, and a six-stand finishing train. The first two roughing rolls are driven by a separate motor. The intermediate train includes groups of two stands to a motor which groups may be of any number required to furnish the desired reduction.

9. The Talbot et al. patent No. 1,987,-876 discloses a mill for rolling rods and bars. This mill includes a four-stand roughing train, a four-stand intermediate train, and a four-stand finishing train. The first two stands of the roughing train are driven by a separate motor.

10. Claims 14 and 16 are incomplete in the omission of the highly essential separate motor drive for each group of two roll stands on the intermediate train and therefore fail to point out and distinctly claim the subject matter of the alleged invention.

11. Alternation of roll pass shape in rolling rounds is old in the art.

12. The limitation as to an even number of roughing roll stands in claims 14 through 18 is not critical.

13. The relative position of the various trains as recited in claim 16 is conventional.

14. In claim 16, the limitation beginning "the selective operation" etc. is functional.

15. In claims 14, 15 and 16, recitation of eight intermediate roll stands is not critical and is a matter of mechanical design.

16. In claim 17, the limitation beginning "for rolling billets" is a limitation of use.

17. In claim 18, the limitation beginning "whereby the spread" is functional.

18. In claim 18, the limitation as to number and grouping of roll stands in the roughing train has no patentable significance in view of Peterson who discloses nine roughing rolls, with a separate motor for the first two. The total of eight rolls in the roughing train is not critical.

19. The main concept of claims 14 through 18 is an intermediate train comprising a plurality of groups of two roll stands, each group being driven by a separate motor, each group having loops between it and adjacent groups or trains, and one stand in each group being selectively operable. This concept is disclosed in Fig. 2 of the Rendleman patent.

20. A roughing train in which the first two roll stands are driven by a separate motor, as recited in claim 18, is disclosed in the patent to Talbot et al. and also in the patent to Peterson.

21. Claims 14 through 18 in their structural limitation recite a combination of old elements which produce no more than the sum of the functions of the elements operating individually.

22. Claims 14 through 18 in their structural limitation recite a combination of old elements, which includes elements disclosed in the patents to Rendleman and to Fisk, all of which elements produce no more than the sum of the functions of the elements operating individually.

23. Claims 14 through 18 in their structural limitation recite a combination of old elements, which includes elements disclosed in the Peterson, the Talbot et al., the Fisk and the Rendleman patents, all of which elements produce no more than the sum of the functions of the elements operating individually.

24. The combination of old elements as recited in claims 14 through 18 would be obvious to one skilled in the art in view of the prior art, particularly the four patents to Rendleman, Fisk, Talbot, et al., and Peterson.

25. Claims 14 through 18 are drawn to an old combination of a roughing train, an intermediate train, and a finishing train as disclosed in each of the patents to Peterson, Talbot, et al., and Fisk. This old combination is also disclosed in the Rendleman patent.

26. Claims 10 and 11 are incomplete in that they fail to set forth the essential controlled loops between the pairs of two stands of the intermediate train and between the intermediate train and the finishing train. These claims therefore fail to point out and distinctly claim the alleged invention.

27. Claims 10 and 11 are further incomplete in failing to set forth the essential number of roughing stands, in failing to set forth roll pass shape alternation, in failing to set forth the essential number of roll stands in the intermediate train, and in failing to set forth how roll pass shape alternation is maintained when passes are omitted as stated in the claims. These claims thus fail to point out and distinctly claim the alleged invention.

28. Claims 10 and 11 are incomplete in that they fail to define the range of product size in which the output by weight of the mill is kept constant. Such output is not maintained for the two smallest sizes and is further not maintained for sizes from $\frac{11}{16}''$ to $1\frac{1}{4}''$. These claims thus fail to point out and distinctly claim the alleged invention.

29. The Rendleman patent discloses a roughing train operating for various product sizes without adjustment of the roll passes, that is, at constant area of exit pass of the roughing train. That patent also discloses an intermediate train comprising groups of two roll stands, each group driven by a separate motor, and separated from other groups or trains by a loop. That patent also discloses in Figures 2 and 6 the maintenance of a constant number of motors and loops in rolling various product sizes, this maintenance being achieved by omitting pairs of roll stands, but only one from a group. Alternation of roll pass shape in rolling rounds is conventional. To operate the mill of the Rendleman patent at constant output by weight or volume for all sizes is a matter of choice. Claim 10 recites substance which would be obvious to one skilled in the art in view of the Rendleman patent.

30. Both the Peterson and the Talbot et al. patents disclose a separately driven first pair of roughing rolls which are inherently adjustable as to area and speed. The addition and operation of such a separate pair of rolls to precede the unadjusted roughing train of the Rendleman patent for the purpose of handling various billet sizes would be obvious to anyone skilled in the art. Claim 11 therefore recites no patentable invention.

31. Any increase of efficiency of operation of the mill disclosed in the application over prior mills in use is attributable to running the mill for all product sizes at constant output equal to the maximum output of a large-output billet-heating furnace. This feature is recited in no claim. Claims 10 and 11 recite only a constant output which may be a low output. Thus the increase in efficiency is not attributable to the substance of the claims.

32. The Jones and Laughlin mill which corresponds in many respects to the application disclosure involves a roughing train which comprises four groups of roll stands, each group driven by a separate motor. This feature is inconsistent with claim 18. The Jones and Laughlin mill is not evidence of commercial success of the substance of claim 18.

33. The three mills built substantially according to the instant application disclosure incorporate various undisclosed features which help to produce quality of product. Those features include roller bearings, hydraulic cylinders, and roller twist delivery guides, beside others. Thus any commercial success is attribu-

table in part to substance other than that claimed.

34. The mills built substantially according to the application disclosure have been operated only with 2½″ billets. Thus there is no evidence of commercial success of the substance of claim 11.

35. 90 to 95% of the product of the three mills built substantially according to the application disclosure has been the small size No. 5 rod. Thus there is no significant evidence of commercial success of the features of the mills which produce flexibility for variation of product size as set forth in the claims.

36. There is no evidence that the mill of the instant application is displacing all prior types. Plaintiff company's competitors' mills are able to compete with that plaintiffs' mill.

37. Claims 10, 11 and 14 through 18 are unpatentable over the prior art.

Conclusions of Law

1. Proposed claims 19 through 22 are not before the Court on the merits.

2. Claims 10, 11, 14 and 16 are unpatentable for failure to point out and distinctly claim the alleged invention as required by 35 U.S.C. § 112.

3. Functional limitations and use limitations are patentably ineffective in apparatus claims.

 4. A combination of old elements which produces no more than the sum of the functions of the elements operating individually and lacks additional function attributable to the fact of combination is unpatentable. For such combination obviousness to one skilled in the art in view of the prior art is presumed and the combination is unpatentable under 35 U.S.C. § 103.

5. Claims 14 through 18 are drawn to an old combination and are therefore unpatentable.

6. The difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

7. Commercial success is immaterial where absence of patentable invention is clear.

8. Evidence of commercial success not directly attributable to the specific substance of the claims is irrelevant to the question of patentability of the claims.

9. Plaintiff company is not entitled to a patent containing any of claims 10, 11, 14 through 18, and proposed claims 19 through 22.

10. The complaint is dismissed.